UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                    23 Cr. 99 (LJL)

KEVIN PEREZ,

Defendant.

**THE GOVERNMENT'S MOTIONS *IN LIMINE***

EDWARD Y. KIM
Acting United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, NY 10278

Michael R. Herman
James A. Ligtenberg
Patrick R. Moroney
Assistant United States Attorneys
    *- Of Counsel -*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................... 1

ARGUMENT ........................................................................................................ 9

I.    ABSENT ADDITIONAL EVIDENCE, THE COURT SHOULD PRECLUDE ANY
EVIDENCE THAT HERNANDEZ WAS IN POSSESSION OF A GUN AT THE TIME PEREZ
SHOT HIM ........................................................................................................... 9

    A.    RELEVANT FACTS ................................................................................... 9
    B.    APPLICABLE LAW ................................................................................. 10
    C.    DISCUSSION .......................................................................................... 11

II.    RAP VIDEOS AND LYRICS BY PEREZ RELATING TO THE CHARGED CRIMES
SHOULD BE ADMITTED ...................................................................................... 12

    A.    APPLICABLE LAW ................................................................................. 14
    B.    DISCUSSION .......................................................................................... 17

III.    THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT CONCERNING
THE POTENTIAL PUNISHMENT OR CONSEQUENCES OF CONVICTION ..................... 18

IV.    THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT THAT WOULD
INVITE NULLIFICATION ...................................................................................... 19

V.    THE COURT SHOULD ADMIT INTO EVIDENCE CERTAIN BUSINESS RECORDS
ON THE BASIS OF WRITTEN DECLARATIONS OF THE RELEVANT CUSTODIAN OF
RECORDS, PURSUANT TO FEDERAL RULES OF EVIDENCE 803(6) AND 902(11) ....... 20

VI.    THE COURT SHOULD ORDER THE DEFENDANT TO COMPLY WITH HIS RULE
16(B) OBLIGATIONS .......................................................................................... 26

CONCLUSION .................................................................................................... 30

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law to request rulings on several evidentiary issues in advance of the trial of Defendant Kevin Perez, set to begin on January 21, 2025. Specifically, the Government seeks rulings:

(1) Precluding Perez from introducing evidence that the victim of the December 16, 2021 shooting had a gun on his person (absent additional evidence that Perez was aware of the gun);

(2) Admitting rap videos and lyrics of Perez, in which he describes his involvement in the crimes charged in the Indictment;

(3) Admitting certain business records based on the written declarations of the relevant custodian of records;

(4) Precluding evidence and argument concerning the potential punishment or consequences that the defendant faces if convicted;

(5) Precluding evidence and argument that invite jury nullification; and

(6) Setting a deadline for the defense to produce Rule 16 discovery.

## BACKGROUND

### I.    Offense Conduct

From at least 2017 to 2023, Defendant Kevin Perez, a/k/a "Kay Flock," was the leader of "Sev Side" or "DOA," a violent street gang operating in the Bronx. Members of Sev Side/DOA had rivalries with several other street gangs, which resulted in acts of violence, including murders and attempted murders. Sev Side/DOA's rivals included the "800 YGz," the "Drillys," "River Park Towers" ("RPT"), the "OYz," and others. At times, Sev Side/DOA had an alliance with a gang called "Third Side"—whose members included Iszayah Rowson and Michael Gant—though there was later tension between Sev Side/DOA and Third Side.[1]

---

[1] Rowson and Gant were charged with racketeering conspiracy and related offenses for their roles in Third Side in *United States v. Iszayah Rowson and Michael Gant*, 22 Cr. 310 (PAE).

1

In connection with their attacks on rival gang members, Sev Side/DOA members traveled together to rival gang territories to "spin the block"—that is, to shoot at gang rivals and others located in the rival gang's territory. As the leader of Sev Side/DOA, Perez personally committed acts of violence against rival gang members and ordered his subordinates to do the same.

Perez and other Sev Side/DOA members frequently posted—on their own social media accounts, stories, and live streams—videos and photos declaring their affiliation with the gang. They also discussed their specific disputes with rival gang members, posting videos and messages taunting the gang rivals, bragging about acts of violence, and threatening additional violence. In many instances, Perez and his co-conspirators live-streamed arguments with rival gang members, which took place on FaceTime, in which both sides threatened violence and retaliation.

Perez, a rap musician, also frequently released rap songs and videos glorifying his leadership in Sev Side/DOA and his desire to harm rival gang members. Other members of Sev Side/DOA, along with some gang rivals, did the same. The violence and rap music were closely linked: in the eyes of Sev Side/DOA members, committing a shooting made a subsequent rap song about that shooting more "authentic," and thereby raised the status or "clout" of the rapper boasting about the shooting. In turn, the boasting in the rap songs fed a cycle of violence where the rival gangs retaliated against each other for perceived slights.

Perez and other members of Sev Side/DOA also earned money together through fraud schemes. In some of these schemes, Perez and other gang members applied for COVID-related small business loans and unemployment claims, using the identifies of other individuals.

In other schemes, Perez and his co-conspirators engaged in bank fraud by obtaining fraudulent checks, depositing them into bank accounts of other individuals (typically with their consent), and withdrawing the funds before the victim banks recognized that the checks were

fraudulent. By using other people's bank accounts to accomplish the fraud, members of Sev Side/DOA were able to obscure their role in the scheme and avoid apprehension by authorities. Sev Side/DOA members recruited these other individuals to allow their bank accounts to be used as part of the scheme, typically through postings and messages on social media. Perez participated in these fraud schemes by using his social media to find individuals with accounts at certain banks and asking others for their debit cards, so that Sev Side/DOA members could deposit fraudulent checks into their accounts.

The acts of violence, and the rap songs boasting about them, were also closely related to the bank fraud scheme. Sev Side/DOA members who raised their status—including their clout as a rapper—by committing shootings were able to use that status to recruit individuals for the bank fraud scheme. For example, Perez, the most well-known rapper, could successfully recruit fans to provide their bank accounts for use in the scheme. Some of the money that was made from the fraud scheme was then used to purchase studio time or apartment rentals for Sev Side/DOA members to record songs and music videos (in which they, again, boasted about committing acts of violence).

Perez personally participated in numerous acts of violence against rival gang members. For example, on June 20, 2020, Perez and a number of allied Third Side members (including Rowson and Gant) traveled to the territory of a rival gang—the 800 YGz—to shoot at rival gang members. During the shooting, Perez and his co-conspirators hit four victims. One of the victims was an 800 YGz gang member known as "Eli" ("Victim-1"). In text messages sent the same day, Perez stated that he and others had hit "Eli in his chin." After the shooting, Perez released a rap song in which he boasted about the shooting. The song included the lyrics: "33 on me . . . if He Gz he get put in a coffin, hole in his face, that boy look like a dolphin [as others in the background yelled 'Eli']."

In these lyrics, "33" refers to a Glock 33 gun; "Gz" refers to the 800 YGz; and Perez brags about putting a "hole" in Victim-1's face so that he looked "like a dolphin."

Six days later, Perez ordered another shooting of rival gang members. On June 26, 2020, a group of individuals were standing in front of 4646 Park Avenue in the Bronx, which served as a sort of headquarters for Sev Side/DOA. Two individuals ran past and opened fire, striking one of the individuals—a Sev Side/DOA member—in the abdomen. Perez ordered his subordinates to take revenge for the shooting. About four hours after the first shooting, two Sev Side/DOA members (Nicholas Johnson and Philip Santiago) drove a Revel electric scooter into the territory of the Drillys, a rival gang that was an ally of the 800 YGz. At least one of Johnson and Santiago opened fire at a group of individuals standing on the sidewalk in Drilly territory. An 18-year-old innocent bystander ("Victim-2") was struck in the cheek, where the bullet lodged. Victim-2 was rushed to the hospital and, fortunately, survived.

Later that summer, on August 10, 2020, Perez and other allied gang members again shot at members of the 800 YGz. They again hit Victim-1, this time in the foot.

On November 10, 2021, Perez ordered other Sev Side/DOA members to travel with him to RPT territory to "spin" RPT. Perez and others (including Sev Side/DOA members Devon Mason and Ervin Beamon) then traveled to RPT territory in a BMW.[2] When they arrived at the rival gang's building, Beamon stood up through the sunroof of the vehicle and began shooting at the group of men standing on the sidewalk outside of the building, fortunately missing their targets. Perez and the others then drove back to the Sev Side/DOA headquarters at 4646 Park Avenue.

---

[2] Perez was pulled over and issued traffic citations while operating the same BMW in Queens on October 23, 2021.

4

On December 16, 2021, Perez murdered a rival gang member, Hwascar Hernandez. The murder was captured on surveillance video. (*See* Ex. A, B). Prior to the murder, Perez traveled to the territory of a rival gang—the OYz—intentionally seeking out a confrontation. The OYz territory was in the Sugarhill section of upper Manhattan, away from Perez's gang's territory in the Bronx. Perez brought a loaded gun, was wearing a mask covering his face, and walked around the rival gang territory asking people whether they were "OY."

At some point, Perez passed a barber shop in the vicinity of West 151st Street and Amsterdam Avenue in Manhattan (still in OY territory). Hernandez was in the barber shop. At the time, Perez was walking with a woman in pink. It appears—based on surveillance video (which does not have sound)—that Perez and Hernandez exchanged words while Perez was outside the barber shop and Hernandez was inside. Perez and the woman in pink then walked away down the street. Hernandez (wearing a black jacket) then followed them, walking behind them down the street:



(*See* Ex. A).

The surveillance video makes clear that, while Hernandez was walking down the street toward Perez and the woman in pink, he did not display a gun. (*See* Ex. A). During this time, it appears that Hernandez and Perez continued to exchange words. (*See id.*). When Perez and the woman in pink reached the corner of West 151st Street and Amsterdam Avenue, Perez turned around, pointed his gun at Hernandez (who was approximately 30 feet away), and fired, striking and ultimately killing Hernandez. (*See id.*; Ex. B (surveillance footage from West 151st Street)).



(Ex. B at 00:15). Prior to the shooting, Hernandez was merely walking down the street toward Perez, with no gun displayed:



(Ex. A at 00:09). One second later, at the moment he was shot (as evidenced by the stuffing from his jacket flying in the air), Hernandez simply had one hand in his pocket and one hand on his zipper:



(Ex. A at 00:10). After shooting Hernandez, Perez ran around the corner and away from the scene down West 151st Street:



(Ex. B at 00:19). As he fled, Perez threw his gun down a set of stairs. Following the shooting, Perez left New York for another state, and did not turn himself in for approximately one week.

## II.    Procedural History

On February 21, 2023, a Grand Jury returned an indictment charging Perez and five other Sev Side/DOA members with various counts related to their participation in the gang and in acts of violence. Count One charged Perez with participating in a racketeering conspiracy from at least 2017 to 2023; Count Two charged Perez with committing a violent crime in aid of racketeering, namely, the December 16, 2021 murder of Hernandez; Count Three charged Perez with murdering Hernandez through the use of a firearm; Count Four charged Perez with attempted murder and assault with a dangerous weapon in aid of racketeering, in connection with the November 10, 2021 shooting at RPT gang members; and Count Five charged Perez with possessing a firearm, which was brandished and discharged, and aiding abetting the same, in connection with the RPT shooting.

**ARGUMENT**

**I.    Absent Additional Evidence, the Court Should Preclude Any Evidence that Hernandez Was in Possession of a Gun at the Time Perez Shot Him**

Count Two of the Indictment charges Perez with murder in aid of racketeering, in connection with the December 16, 2021 murder of Hwascar Hernandez. Perez is charged with shooting and killing Hernandez in violation of New York Penal Law Sections 125.25 and 20.00. The Government anticipates that Perez may attempt to raise a self-defense argument under New York law. In support of that argument, Perez may attempt to introduce evidence that, following the shooting, medical workers found a gun on Hernandez's person.

As far as the Government can tell, however, Perez was not aware that Hernandez was in possession of a gun at the time Perez shot him. Absent additional evidence that Perez knew that Hernandez had a gun, the fact that Hernandez was later found in possession of a gun is irrelevant and should be precluded. *See* Fed. R. Evid. 401. And even assuming Hernandez's possession of a gun (unbeknownst to Perez) had some relevance (and it does not), any limited relevance is substantially outweighed by the danger of unfair prejudice and misleading the jury. *See* Fed. R. Evid. 403. In particular, such evidence could be used to blame the victim and paint Hernandez in an unfavorable light. Accordingly, absent additional evidence from the defense, evidence that Hernandez had a gun should be precluded under Rule 403 as well.

**A.    Relevant Facts**

As discussed above, on December 16, 2021, Perez shot and killed Hernandez near West 151st Street and Amsterdam Avenue in Manhattan. Prior to the shooting, Hernandez left a barber shop and followed Perez down Amsterdam Avenue. While he followed Perez down the street, Hernandez did not display a gun—as the surveillance video makes clear. (*See* Ex. A). When Perez reached the corner of West 151st Street and Amsterdam Avenue, he turned around, pointed his

gun at Hernandez, and shot and killed him. (*See* Ex. A, B). At the time Perez shot Hernandez, Hernandez was simply walking toward him with a hand in his pocket. (*See* Ex. A).

After the shooting, medical personnel treating Hernandez found a gun on his person.

### B.    Applicable Law

#### 1.    Federal Rules of Evidence 401 and 403

Under Rule 401 of the Federal Rules of Evidence, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 403 of the Federal Rules of Evidence provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.

#### 2.    New York Self-Defense Law

Under New York Penal Law § 35.15, a person may generally (with some exceptions) "use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person." N.Y. Penal Law § 35.15(1). The statute clarifies that "[a] person may not use deadly physical force upon another person" unless "the actor reasonably believes that such other person is using or about to use deadly physical force." N.Y. Penal Law § 35.15(2)(a). "Even in such case," the statute continues, "the actor may not use deadly physical force if he or she knows that with complete personal safety," he "may avoid the necessity of doing so by retreating." N.Y. Penal Law § 35.15(2)(a).

In short, under Section 35.15, a defendant's use of deadly physical force is only justified where, among other things, he (1) subjectively believed that deadly physical force was necessary

to defend himself, and that belief was objectively reasonable under the circumstances; and (2) he retreated from the encounter if he knew that he was able to do so with complete safety. *See* N.Y. Penal Law § 35.15; *see also Jackson v. Edwards*, 404 F.3d 612, 623 (2d Cir. 2005) ("The leading New York cases construing the justification defense . . . establish a subjective and an objective component: The fact-finder must determine that the defendant believed deadly physical force was necessary and that a reasonable person would have believed the use of deadly physical force was necessary under the same circumstances. . . . New York law also imposes a duty to retreat in some circumstances: If a defendant who is confronted with deadly physical force knows he can retreat with complete safety but fails to do so, the justification defense is lost.").

**C.    Discussion**

Unless the defense presents additional evidence demonstrating Perez's knowledge that Hernandez had a gun at the time of the shooting, evidence of Hernandez's gun possession should be precluded. The surveillance video shows that, at the time of the shooting, Hernandez was not displaying a gun. (*See* Ex. A). As far as the Government can tell, Perez did not know that Hernandez was in possession of a gun when Perez shot him. And if Perez did not know that Hernandez had a gun, Hernandez's possession of a gun had no impact on (1) whether Perez subjectively believed that deadly physical force was necessary to defend himself; (2) whether Perez's belief was objectively reasonable based on the facts available to him; or (3) whether Perez believed he would have been able to safely retreat. *See* N.Y. Penal Law § 35.15; *Jackson*, 404 F.3d at 623. Accordingly, absent additional evidence from Perez, Hernandez's possession of a gun is irrelevant and should be precluded. *See* Fed. R. Evid. 401.

Moreover, even assuming Hernandez's possession of a gun—unbeknownst to Perez—had some relevance, any limited relevance is substantially outweighed by the danger of unfair

prejudice, confusing the issues, and misleading the jury. *See* Fed. R. Evid. 403. For example, evidence that Hernandez was in possession of a gun would vilify the victim, suggest he was a bad person, and encourage jury nullification. *See United States v. Malpeso*, 115 F.3d 155, 163 (2d Cir. 1997) (holding that court has authority under Rule 403 to preclude evidence to prevent defense from pursuing a nullification strategy). Such evidence would also confuse the issues and mislead the jury into thinking that Hernandez's possession of a gun—despite being unknown to Perez— somehow bears on Perez's subjective belief as to whether deadly physical force was necessary to defend himself. *See* N.Y. Penal Law § 35.15; *Jackson*, 404 F.3d at 623.

In sum, unless Perez comes forward with additional evidence demonstrating his knowledge that Hernandez had a gun, any evidence of Hernandez's gun possession should be precluded as irrelevant or, in the alternative, under Rule 403.

## II.    Rap Videos and Lyrics by Perez Relating to the Charged Crimes Should be Admitted

At trial, the Government seeks to admit certain of Perez's music videos that have been publicly posted to YouTube.[3] The evidence at trial will establish that members of Sev Side/DOA promote each other's music, and Perez in particular has become well-known for his music in the subgenre of "drill music."[4] Sev Side/DOA members frequently appear in music videos together and will give each other "features" (*i.e.*, portions of their songs to perform rap solos) on their songs to rap about their rivalries with other gangs and the shootings they commit.  Some of the Sev Side/DOA criminal proceeds are used to buy studio time to record the rap songs where members boast about committing shootings against members of their rival gangs called "opps." As explained

---

[3] A representative sample of the music videos the Government seeks to introduce are set forth in Exhibit C with corresponding lyrics in Exhibit D. In connection with this motion, the Government is submitting these exhibits via USAfx.

[4] *See, e.g.* "Drill Music," https://en.wikipedia.org/wiki/Drill_music.

above, the shootings and rap music are closely linked: committing a shooting makes a subsequent rap song about that shooting more "authentic," and thereby raises the status of the rapper boasting about the shooting, and the boasting feeds a cycle of back-and-forth violence. Moreover, members of the gang used fraud proceeds to purchase studio time to record rap music that glorified the gang.

The Government seeks to offer the music video clips to corroborate the existence and purpose of the Sev Side/DOA gang and the relationship among Perez and his co-conspirators (including the other charged co-defendants), many of whom are present alongside Perez in the music video clips and will be identified at trial by cooperating witnesses. The music video clips further establish Sev Side/DOA's violent back-and-forth conflict with its rival gangs. For example, Perez makes multiple references to "opps," or rival gang members, throughout the music videos and specifically calls out rival gang members and references specific acts of violence against them.

The rap lyrics similarly establish the existence of Sev Side/DOA, define its membership and rivalry with the opposing gangs, including the 800 YGz, Drillys, RPT, and OYz, and describe Sev Side/DOA's involvement in violence. For example, in multiple music video clips, Perez raps in front of 4646 Park Avenue in the Bronx, which, as explained above, operated as the SevSide/DOA headquarters. In the song "Kay Flock-FTO (22 blixky Freestyle Remix)," Perez raps in front of that location with a large group of people, including co-defendant Beamon, who display gang signs And in the song "Brotherly Love," Perez refers to DOA, rapping: "Like, better run, 'cause I shoot with no sympathy (Sympathy) / DOA bitch, I'm dumpin' on anything."

Moreover, the music videos corroborate specific acts of violence committed by Perez and his fellow gang members in SevSide/DOA, along with gang members in allied gangs like Third Side. For example, in "Who Really Bugging," Perez and other members of Sev Side/DOA rap with members of Third Side, including Rowson, about the shooting of the 800 YGz member known

13

as "Eli" (that is, Victim-1), which Rowson, Perez, and others committed, and which resulted in Victim-1 being shot in the face. In particular, in this song, which was released approximately two months after the shooting, Cinque Grazette, a/k/a "Cin Munna," who is a member of Third Side, Perez and Rowson all rap about Perez and Rowson's role in the shooting of Cook, as well as reaffirming in this song that Sev Side/DOA and Third Side are aligned in their opposition to 800 YGz and Drilly. As noted above, Perez raps, "33 on me . . . if He Gz he get put in a coffin, hole in his face, that boy look like a dolphin. [As others in the background yell "Eli".] Spin the 8th know I'm causing extortion." In this lyric Perez, specifically refers to Victim-1 having a "hole in his face" after he was shot in the face after Perez, and others went to "spin the 8th" (*i.e.*, spin the 800 YGz territory and shoot at them). Earlier in the song, an allied member of Third Side raps that "four opps got hit" a reference to that same shooting, when Victim-1 and three others got shot in that same shooting by Rowson and Perez. At the conclusion of the song, Perez raps "big YGK," indicating that he is a "killer" of the YGz.

### A.    Applicable Law

#### 1.    Admissibility of Rap Lyrics

"Rap lyrics . . . are properly admitted . . . where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice." *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015). In *Pierce*, the Second Circuit rejected a defendant's claim that admitting rap lyrics violated the First Amendment, because "speech was not the basis for the prosecution, but instead it was used to establish the existence of, and [the defendant's] participation in, the alleged RICO enterprise." *Id.* The admissibility of rap lyrics, like other evidence, is thus determined by straightforward application of the Federal Rules of Evidence. *See id.* (citing *United States v. Moore*, 639 F.3d 443, 447-48 (8th Cir. 2011) (affirming admission of

profane and violent rap recordings where lyrics were probative of defendant's participation in narcotics conspiracy)); *United States v. Belfast*, 611 F.3d 783, 820 (11th Cir. 2010) (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice where lyrics were used to show defendant's membership in criminal organization)); *United States v. Brown*, 2017 WL 2493140, *2 (S.D.N.Y. June 9, 2017).

## 2. Federal Rule of Evidence 403

Federal Rule of Evidence 403 provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that does not mean it is "unfairly" prejudicial. *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair."). The Supreme Court has defined "unfair prejudice" as "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof of the specific offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). The Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000); *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony.") (citations omitted).

The Second Circuit has repeatedly found that rap lyrics are admissible under Rule 403 when they are probative of material issues at trial, like the defendant's intent and knowledge,

relationship and affiliation between individuals in a racketeering conspiracy, or admissions relating to one of the charged offenses. *See Pierce*, 785 F.3d at 841 (finding that rap videos were admissible under Rule 403 as evidence of the defendant's association with the alleged RICO enterprise and his animosity towards a rival gang); *United States v. Herron*, 762 F. App'x 25, 30 (2d Cir. 2019) (finding that rap videos offered as evidence of defendant's "participation in the charged conspiracies and crimes, his position as a leader of the MMDB [the Murderous Mad Dog Bloods], his familiarity with firearms and the drug trade, and his relationship to certain cooperating witnesses" were plainly relevant and admissible under Rule 403); *United States v. Barrett*, 750 F. App'x 19, 22 (2d Cir. 2018) (rap videos properly admitted to prove defendant's (1) association with two of his co-conspirators, (2) use of the same Mercedes driven in the charged robberies, and (3) co-conspirators' possession of guns); *see also United States v. Carpenter*, 372 F. Supp. 3d 74, 78 (E.D.N.Y. 2019) (admitting videos that referred to co-conspirators, drugs, and weapons under Rule 403); *United States v. Brown*, 2017 WL 2493140, at *2 (S.D.N.Y. June 9, 2017) (DLC) (admitting rap video and lyrics under Rule 403).

### 3. Federal Rule of Evidence 801

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy."[5] Additionally, Rule 801(d)(2)(B) provides that a statement is not hearsay if offered against an opposing party and "is

---

[5] To admit a statement pursuant to this rule, a district court must find by a preponderance of the evidence: First that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). These prerequisites need be proved only by a preponderance of the evidence. *United States v. Orena*, 32 F.3d 704, 711 (2d Cir. 1994); *see also United States v. Padilla*, 203 F.3d 156, 162 (2d Cir. 2000).

one the party manifested that it adopted or believed to be true." Courts have found that rap lyrics are admissions or adopted admissions of defendants who make appearances and actively participate in the videos. *See United States v. Graham*, 293 F. Supp. 3d 732, 738 (E.D. Mich. 2017) (finding that rap lyrics are adopted statements of defendants who "have appearances in the Rap Tracks and are seen participating by wearing gang colors, making gang signs, throwing money and singing along to the lyrics in the videos" because "it shows their adoption and belief in the statements").

### B.    Discussion

The music video and rap lyrics excerpts that the Government seeks to introduce are admissible under Rule 403. Indeed, the rap lyrics and music videos, in which Perez interacts with members of Sev Side/DOA, along with the allied gang Third Side, acknowledge his gang affiliation and reference specific criminal conduct carried out in support of the enterprise, and are relevant evidence constituting direct proof of the charged crimes. Specifically, the lyrics and the corresponding video are probative of: (1) the existence of the Sev Side/DOA gang, Perez's membership (and leadership) in the gang, and Perez's co-conspirators in Sev Side/DOA; (2) Sev Side/DOA's (along with their allied gangs') use and threatened use of violence against rival gangs, and the ways in which members of the gang can increase in position and stature within the gang by committing acts of violence. The lyrics and music videos do not contain speculative, theoretical, or abstract statements; rather, they directly relate to the charged offenses by establishing the existence of the charged enterprise and the pattern of criminal activity associated with the enterprise. *See Graham*, 293 F. Supp. 3d at 738 ("The court finds that the [rap lyrics] are not merely abstract beliefs of the defendants, because the government has tied the lyrics to the actions of the defendants."); *United States v. Stuckey*, 253 F. App'x 468, 482-83 (6th Cir. 2007) (finding that the

17

Court properly admitted rap lyrics into evidence where lyrics "concerned killing government witnesses and specifically referred to shooting snitches, wrapping them in blankets, and dumping their bodies in the street—precisely what the Government accused Stuckey of doing to Darbins in this case.").

Meanwhile, the dangers of unfair prejudice resulting from the admission of these rap lyrics are extremely low. The Government is only seeking to admit a limited number of music videos that are narrowly tailored to address issues in the case—all of which Perez or a fellow gang member propagated and promoted on the internet to their followers and the public at large. Additionally, the rap lyrics are no more inflammatory than the actual charges in this case, which involve a murder, shootings, gun possession, and fraud. *See United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (explaining that evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime[s]"); *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir 1992) (noting evidence "did not involve conduct any more sensational or disturbing than the crimes with which [the appellants] were charged")). Based on this record, there is no risk that unfair prejudice will substantially outweigh the probative value of the music video clips and rap lyrics.

## III. The Court Should Preclude Evidence and Argument Concerning the Potential Punishment or Consequences of Conviction

The defendant should be precluded from offering evidence or argument concerning the potential punishment or consequences that he faces if convicted. If convicted of the Count Two in the Indictment, for example, the defendant faces a mandatory life sentence. Where, as here, the jury has no role at sentencing, it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning

18

punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* There is no proper basis for the defendant to put these issues before the jury in any form, and the defendant should not be permitted to offer evidence or argument inviting the jury to consider them. *See, e.g.*, *United States v. Avenatti*, No. 19 Cr. 374, Dkt. 288 (JMF) (S.D.N.Y. Jan. 13, 2022) (Tr. 9-10) ("anything that adverts to possible punishments, including possibility of incarceration, however obliquely, is improper and will not be permitted," including, for example, a statement in opening or closing arguments that the defendant's "liberty is at stake," which would be "a not-so-thinly veiled reference to the prospect of incarceration, which is altogether improper").

## IV.    The Court Should Preclude Evidence and Argument that Would Invite Nullification

The defendant should be precluded from offering evidence of or arguments about aspects of his life that have no bearing on his guilt or innocence and may tend to elicit the jury's sympathy, such as those relating to his family background, health, age, or any other similar, irrelevant, personal factors. Such evidence and argument that make the defendant appear sympathetic for reasons unrelated to the charges at issue invite the jury to acquit a defendant even where the evidence proves his guilt beyond a reasonable doubt. Juries are not "to act based on their . . . sympathy." *United States v. Stroming*, 838 F. App'x 624, 627 (2d Cir. 2021); *see, e.g.*, *United States v. Mustafa*, 753 F. App'x 22, 37 (2d Cir. 2018) ("The district court correctly recognized that evidence of solitary confinement could be used for the improper purpose of provoking juror sympathy."). Any attempt to encourage such sympathy is therefore an attempt at nullification, which is itself plainly improper. *See, e.g.*, *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (observing that jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent").

19

In keeping with these principles, the defendant should be precluded from offering evidence and argument concerning his family background, health, age, religion, or other similar personal factors, absent a showing that such factors bear on his culpability. *See, e.g.*, *United States v. Paccione,* 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, No. S9 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of [d]efendant's family and personal status" as not "relevant to the issue of whether [d]efendant committed the crimes charged"); *United States v. St. Rose*, No. 11 Cr. 349 (SJ), 2012 WL 1107659, at *1 (E.D.N.Y. Apr. 2, 2012) (precluding evidence of the defendant's immigration status because it does "not bear on the [d]efendant's innocence or guilt"). Such evidence is irrelevant to the jury's determination of guilt and should be precluded.

**V.    The Court Should Admit into Evidence Certain Business Records on the Basis of Written Declarations of the Relevant Custodian of Records, Pursuant to Federal Rules of Evidence 803(6) and 902(11)**

During its case-in-chief at trial, the Government expects to introduce business records from several entities, including Facebook and Instagram (owned by Meta Platforms, Inc ("Meta").), the Arizona Department of Economic Security, and the New York State Department of Labor. In addition, the Government anticipates introducing video footage from a number of locations. To help streamline the trial, on December 16, 2024, the Government submitted 12 proposed stipulations to defense counsel, along with a reference guide detailing where in the discovery the defense could locate the relevant materials. The Government explained that the purpose of the stipulations was to avoid prolonging the trial by calling unnecessary custodial witnesses to establish authenticity or other basic facts that were unlikely to be contested, and requested a call

to discuss the proposed stipulations.  To date, the Government has not received a response.[6]

A finding by the Court that certain business records may be introduced pursuant to written certification under Rule 902(11) will obviate the need for significant inconvenience and expenditure of time by third parties who would otherwise need to testify at trial.  Moreover, a finding by the Court that business records may be introduced pursuant to written certification would meaningfully streamline the Government's presentation of evidence, serving the ends of judicial economy and taking into consideration the time and attention of the jury.  Rule 902(11) exists for precisely this reason.

### A.    Applicable Law

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court found that out-of-court statements that are "testimonial" violate the Confrontation Clause of the Sixth Amendment and are inadmissible unless the declarant is unavailable, and the defendant has had prior opportunity to cross-examine the declarant regarding the statement.  However, under Federal Rule of Evidence 104(a), preliminary determinations concerning the admissibility of evidence are made by the district court, and in making such determinations, the district court is not bound by the rules of evidence.  Accordingly, a judge's use of hearsay evidence to decide a preliminary question of admissibility under Rule 104(a) does not implicate the Confrontation Clause.  *See United States v. Matlock*, 415 U.S. 164, 174-75 (1974) (upholding the use of hearsay testimony at a suppression hearing); *Bourjaily v. United States*, 483 U.S. 171, 178 (1987) (upholding use of hearsay in determination of admissibility of coconspirator statements); *United States v. Mastrangelo*, 693 F.2d 269, 273 (2d Cir. 1982) (endorsing use of hearsay evidence under Rule 104(a)).  As such, the

---

[6] The Government made an initial request for a call to discuss stipulations three days earlier, on December 13, 2024.

Confrontation Clause is not implicated when certifications seeking to authenticate business records under Rule 902(11) are presented to the Court for the purpose of an admissibility determination under Federal Rule of Evidence 104 and not admitted into evidence. *See United States v. Qualls*, 53 F. Supp. 2d 241, 245 (E.D.N.Y. 2008), *aff'd summary order*, 613 Fed. Appx. 25 (2d Cir. 2015) (finding that certifications that were not in evidence present no Confrontation Clause issue).

Moreover, even if the certifications themselves were admitted as evidence, the Second Circuit has held that business records properly admitted under Federal Rule of Evidence 803(6) "cannot be testimonial because a business record is fundamentally inconsistent with what the Supreme Court has suggested comprise the defining characteristics of testimonial evidence." *United States v. Feliz*, 467 F.3d 227, 233-34 (2d Cir. 2006); *see also Davis v. Washington*, 547 U.S. 813, 822 (2006) (statements are "testimonial" if their "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution").

Under Rule 803(6), a record may be admitted as non-hearsay if it was made at or near the time by someone with knowledge, or who had the information transmitted to them by someone with knowledge; the record was kept in the course of a regularly conducted activity of a business or organization; and making the record was a regular practice of that business activity. Fed. R. Evid. 803(6). "The principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632-33 (2d Cir. 1994) (internal quotation marks omitted). The Second Circuit has taken a "generous view of the business records exception, construing it to favor [] the admission of evidence . . . if it has any probative value at all." *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) (internal citations omitted).

Business records of regularly conducted activity that meet the necessary conditions to

22

qualify under the hearsay exception may be authenticated, among other methods, by a certification that complies with Rule 902(11). Fed. R. Evid. 803(6)(D); *see also United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) ("Records are self-authenticating if they include a custodian certification that the records 'meet[] the requirements of Rule 803(6)(A)-(C).'"). Specifically, Rule 902(11) provides, in relevant part, that "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person" is self-authenticating and requires no extrinsic evidence of authenticity to be admitted. Prior to trial, the proponent of the records must also give the adverse party reasonable written notice of the intent to offer the records and make the records and certifications available for inspection so that the adverse party has a fair opportunity to challenge them. *Id.*

Just as properly admitted business records are not considered testimonial, so too a certificate required under Rule 902(11) to authenticate such records is not considered testimonial. In *United States v. Qualls*, 53 F. Supp. 2d 241, 245 (E.D.N.Y. 2008), *aff'd summary order*, 613 Fed. Appx. 25 (2d Cir. 2015), the court held that authentication of foreign business records pursuant to Section 3505 did not violate the Confrontation Clause of the Sixth Amendment. In so holding, the court reasoned that prohibiting the admission of records necessary to authenticate the business records themselves would be contrary to the Supreme Court's intention to support the admission of business records as nontestimonial. *Id.* At 246. The court further observed that judicial economy would be reduced with little gain to the truth-seeking process if these business records had to be authenticated by live witness testimony. *Id.*

Although the Second Circuit's summary order affirming the decision in *Qualls* did not explicitly reach the question of whether a certificate authenticating business records could itself be considered testimonial, all other circuits that have addressed the question have held that it is

not.  *See, e.g.*, *United States v. Yeley-Davis*, 632 F.3d 673, 678 (10th Cir. 2011) (certificate of authenticity presented under Rule 902(11) is not testimonial); *United States v. Anekwu*, 695 F.3d 967, 077 (9th Cir. 2012) (not plain error for district court to admit business records authenticated by certificate where the purpose of the certificate was merely to authenticate the records and not to establish or prove a fact at trial); *United States v. Adefehinti*, 510 F.3d 319, 327-38 (D.C. Cir. 2008) (authentication of hundreds of loan applications, sales contracts, promissory notes, verifications of deposit and of employment by way of 902(11) certifications by numerous custodians of record is permissible under *Crawford*); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) (written certification attesting to authenticity of business record is not testimonial evidence); *see also United States v. Al-Imam*, 382 F. Supp. 3d 51, 59-60 (D.D.C. 2019) ("Every court that has addressed this issue has concluded that admission of certifications pursuant to Rule 803(6)—including § 3505 and its analogs in Rule 902(11) and (12)—does not pose Confrontation Clause problems" and gathering cases).

Furthermore, as the Second Circuit has recognized, "[a] business record may include data stored electronically . . . and later printed out for trial so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice." *Potamkin Cadillac Corp*, 38 F.3d at 632 (alterations omitted). The Second Circuit has, accordingly, affirmed the admission of information drawn from such electronic databases for purposes of trial. *United States v. D'Agostino*, 638 Fed. Appx. 51, 55 (2d Cir. 2016) (IRS account transcripts that "merely decode information that IRS agents previously entered into" IRS database properly admitted as business records); *United States v. Bonomolo*, 566 Fed. Appx. 71, 73-74 (2d Cir. 2014) (spreadsheet of data compiled as ordinary part of business was admissible as a business record); *see also United States v. Warner*, 638 Fed. Appx. 961 (11th Cir. 2016) (affirming

admission of spreadsheets summarizing fraudulent tax returns allegedly submitted by defendant); *United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6), even though the printouts themselves are not kept in the ordinary course of business.") (internal citations omitted). Other courts have likewise admitted reports generated by querying bank databases containing a "compilation of data" maintained in the ordinary course of business. *See, e.g.*, *United States v. Battles*, 514 Fed. Appx. 242, 249 (3d Cir. 2013) (spreadsheet that "depicted a small portion of the [bank] database" was admissible business record despite fact "[t]hat the spreadsheet excerpt was created for the purpose of litigation"); *United States v. Glasser*, 773 F.2d 1553, 1558-59 (11th Cir. 1985) (computer printouts containing compilations of various mortgage account transactions that were basis of prosecution were admissible under business records exception); *Remington Inv., Inc. v. Quintero & Martinez Co.*, 961 F. Supp. 344, 351 (D.P.R. 1997) (admitting FDIC report that was "compilation of data from 'matters observed,' namely, the business records of the Bank").

**B.    Discussion**

The Government has previously produced written certifications from Meta and is in the process of obtaining written certifications from the other entities. The Court should admit such business records pursuant to written certifications under Rule 902(11). A proper foundation for admission of the records will be established by the certificate of the relevant records custodian. *United States v. Weigand*, No. 20 Cr. 188 (JSR), 2021 WL 568173, at *3 (S.D.N.Y. Feb. 14, 2021) (admitting several types of records pursuant to Rule 902(11) because "[d]efendants offer no specific reason to doubt the self-authenticability"); *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 141 (S.D.N.Y. 2015) (admitting emails as business records where

25

custodian of records for non-party certified that they met all criteria and opposing party had not shown indicia of lack of trustworthiness); *see also* 5 Weinstein's Federal Evidence, § 803.08[8][b], at 803–82 ("Instead of providing live testimony from a custodian or other qualified witness, the proponent of business records may choose to present the foundation by a certification that complies with Rule 902(11) . . . .") (emphasis added). The certifications themselves are properly considered by the Court pursuant to Rule 104(a) and will not be admitted at trial.

Although the admissibility of the specific records will, of course, be subject to the Court's determination at trial as to relevance, the certifications will obviate the need for significant inconvenience and expenditure of time by third parties in order to authenticate the records. Accordingly, the Government respectfully requests that the Court rule that the Government may introduce at trial business records for which it has a valid certificate under Federal Rule of Evidence 902(11), provided that the certificate satisfies Rule 803(6).

## VI.    The Court Should Order the Defendant To Comply with his Rule 16(b) Obligations

Pursuant to Federal Rule of Criminal Procedure 16(b)(1)(A), if a defendant "requests disclosure under Rule 16(a)(1)(E) and the government complies," then the defendant must permit the Government to inspect any documents in the defendant's "possession, custody, or control," which the defendant intends to use in his "case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A).

On May 9, 2023, at the time of the Government's first discovery production, the Government requested in writing, reciprocal disclosures from the defendant pursuant to Rule 16(b). In its subsequent discovery productions, the Government reiterated its request for reciprocal discovery.

On November 21, 2024, the Government provided written disclosure, pursuant to Fed. R. Crim. P. 16(a)(1)(G) of the expert testimony of three proposed experts that the Government intends to offer at trial. In that letter, the Government again reiterated its request for reciprocal discovery.

26

To date, although the Government first requested reciprocal discovery more than 18 months ago and trial is a month away, Perez has produced no reciprocal discovery materials in response to the Government's request. Accordingly, the Court should require Perez to produce all documents and evidence subject to disclosure under Rule 16(b), including, but not limited to, substantive, non-impeachment evidence and expert disclosure materials, on or before January 3, 2025, which is the date the Court already set for defense expert disclosures. (Dkt. 150).

*First*, Rule 16(b) unambiguously imposes on the defendant an obligation to produce materials he intends to introduce during a defense case-in-chief. This obligation is triggered by the Government's production of discovery under Rule 16(a). *See* Fed. R. Crim. P. 16(b)(1) (requiring disclosure "[i]f a defendant requests disclosure under Rule 16(a)(1)(E) and the Government complies"). When the defendant "avail[s] himself of the strategy to obtain discovery of the government, he must comply with the requirement for reciprocal discovery." *United States v. Ryan*, 448 F. Supp. 810, 810-11 (S.D.N.Y. 1978), *aff'd*, 594 F.2d 853, 811 (2d Cir.); *see* Fed. R. Crim. P. 16 Advisory Committee Note—1974 Amend. ("The majority of the Advisory Committee is of the view that . . . the giving a broader right of discovery to the defense is dependent upon giving also a broader right of discovery to the prosecution.").

Put simply:

> Rule 16 presents a defendant with certain options that may require her to make difficult choices. On the one hand, a defendant can forego discovery of the evidence that the government intends to use in its case-in-chief, and thereby avoid being required to disclose the evidence that she intends to use in support of her defense. On the other hand, the defendant may decide that it is more important to know what evidence the government intends to use at trial, than it is to avoid disclosure of the defense's evidence. Rule 16, however, does not allow the defendant to have it both ways, i.e., she cannot obtain the government's evidence without disclosing her own evidence (other than impeachment evidence).

27

*United States v. Larkin*, No. 12 Cr. 319 (JCM), 2015 WL 4415506, at *5 (D. Nev. July 20, 2015).

Here, Perez has made his choice by requesting and receiving the Government's discovery productions, and he must now be required to comply with his reciprocal obligations under Rule 16.  He should not be permitted to "have it both ways."  *Id*.

On that basis, courts in this District "routinely set a deadline for [Rule 16(b)] disclosures at least a few *weeks* before the start of trial, even over defendants' objections," and before they have made a final decision to introduce an item at trial.  *United States v. Shea*, No. S2 20 Cr. 412 (AT), Dkt. No. 206 (S.D.N.Y. May 4, 2022).  Although "[a] defendant would always like more information about the government's case before revealing anything about his or her own," Rule 16 "conditions a defendant's disclosure obligations on the government's having made certain specified disclosures, not on the government's laying open its entire case or the defendant's satisfaction."  *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2011 WL 723530, at *5 (S.D.N.Y. Feb. 25, 2011).  For instance, in *United States v. Huntress*, the court rejected the argument that the defense need not provide reciprocal discovery because it had "not made any decision as to whether it will be putting a case on at trial, as we do not know if the government will meet its burden of proof at trial."  No. 13 Cr. 199 (WMS), 2015 WL 631976, at *33 (W.D.N.Y. Feb. 13, 2015); *see also, e.g.*, *United States v. Maxwell*, No. 20 Cr. 330 (AJN), Dkt. No. 297 (S.D.N.Y. June 2, 2021) (setting a defense Rule 16 deadline of three weeks before trial, over the defendant's objection); *United States v. Madonna*, No. 17 Cr. 89 (CS), Dkt. No. 655 (S.D.N.Y. Mar. 1, 2019) (requiring "Defendants to produce reverse Rule 16 discovery" thirty-three days before trial and stating that "[t]he Court enforces Rule 16 and will if appropriate preclude evidence that has not been turned over" by the defense (citing *United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017))); *United States v. Jasper*, No. 00 Cr. 825 (PKL), 2003 WL 223212, at *4 (S.D.N.Y. Jan. 21, 2003)

(explaining that "[a]llowing [the] defendant to defer the provision of such discovery until a final determination regarding whether or not [to] put an expert witness on the stand would seem to frustrate" the goal of allowing the government a fair opportunity to prepare).

*Second*, permitting Perez to further delay disclosure of Rule 16 materials would only serve the purpose of facilitating gamesmanship and delay the orderly proceedings of trial. Upon receipt of reciprocal discovery, the Government will need to review the materials and may choose to take investigative steps of its own to, among other things, evaluate the authenticity or completeness of those materials and locate relevant rebuttal evidence. The Government also must review those materials to make determinations as to whether to make any objections on admissibility grounds, and the Court will in turn need time to resolve such objections. Perez should be required to produce any discoverable materials to the Government on or before January 3, 2025, to allow the Government fair preparation for trial and, if possible, to help the Court and the parties streamline the trial—particularly where the Government has now noticed three expert witnesses and the Government has not received any notice as to whether the defense intends to disclose any experts. *See, e.g.*, *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991) (affirming preclusion of evidence defendant had failed to produce and explaining that permitting defendant to use documents the prosecution had not timely seen "would have given the defense an unfair advantage"); *United States v. Shea*, No. S2 20 Cr. 412 (AT), Dkt. No. 206 (S.D.N.Y. May 4, 2022) ("remind[ing]" Defendant that "the Court has 'broad discretion in fashioning a remedy' to address any instances of a party's non-compliance with their Rule 16 obligations, including 'ordering the exclusion of evidence' where it finds that Defendant could have timely disclosed such evidence under Rule 16, but chose not to do so." (quoting *United States v. Lee*, 834 F.3d 145, 158 (2d Cir. 2016))); *United States v. Napout*, No. 15 Cr. 252 (PKC), 2017 WL 6375729, at *8 (E.D.N.Y. Dec. 12, 2017)

(describing the "approach used by many courts": "if the Court determine[s] that a Defendant could have made timely disclosure, but failed to timely do so, the defendant ran the risk that the exhibit would be excluded").

Accordingly, the Court should require Perez to produce to the Government all documents and evidence subject to disclosure under Rule 16(b), including, but not limited to, substantive, non-impeachment evidence and expert disclosure materials, no later than January 3, 2025.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court grant the Government's motions *in limine*.

Dated: New York, New York
      December 20, 2024

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney for the
Southern District of New York

By:      /s/
           Michael R. Herman
           James A Ligtenberg
           Patrick R. Moroney
           Assistant United States Attorneys
           (212) 637-2221 / -2409 / -2466