USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __8/4/2025__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
:
UNITED STATES OF AMERICA :
:
    -v- :
: 23-cr-99 (LJL)
KEVIN PEREZ, :
: OPINION AND ORDER
                    Defendant. :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Kevin Perez ("Defendant" or "Perez") moves pursuant to Federal Rule of Criminal Procedure 29(c) for a judgment of acquittal. Dkt. No. 234. For the following reasons, the motion is denied.

## BACKGROUND

On March 20, 2025, Perez was convicted after a two-week jury trial on Counts 1, 4, and 5 of an indictment filed on February 21, 2023 (the "Indictment"). Dkt. No. 1. Count One charged Perez with racketeering conspiracy in violation of 18 U.S.C. § 1962(d). *Id.* ¶¶ 1–7. Count Four charged Perez with committing a violent crime in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), and 2 in connection with a November 10, 2021, assault with a dangerous weapon and attempted murder in the River Park Towers neighborhood. *Id.* ¶¶ 13–15. Count Five charged Perez with knowingly using and carrying a firearm in furtherance of a crime of violence (the crime charged in Count Four) and possessing a firearm which was brandished and discharged in violation of 18 U.S.C. §§ 924(c) and 2. *Id.* ¶ 16. Perez was acquitted on Count Two of the Indictment which charged him with violent crime in aid of racketeering in violation

of 18 U.SC. §§ 1959(a)(1) and 2 in connection with the December 16, 2021, murder of Hwascar Hernandez in New York, New York. *Id.* ¶¶ 9–11.[1]

The evidence at trial, viewed in the light most favorable to the Government, established that Perez was a leader of a violent gang known as Sev Side/DOA based in the vicinity of East 187th Street in the Bronx. Tr. 198:7–12, 198:17–21, 771:12–13. The gang's headquarters was located at 4646 Park Avenue in the Bronx. Tr. 267:14–18. Its members included Perez (Tr. 200:17–201:18; GX 1), "EJ" (Tr. 202:10–203:3; GX 3), Nick Saint (Tr. 210:2–15; GX 5), Devon Mason a/k/a "BJ" (Tr. 201:4–202:3; GX 2), and "Meech" (Tr. 216:5–15; GX 8). Gang members perpetrated violence in the community and funded their activities through fraud. Tr. 198:23–199:3, 199:7–8.

Sev Side/DOA had violent rivalries with other Bronx-based gangs such as the Drillys, the 800s, and River Park Towers ("RPT"), which is named after an apartment complex where the gang in based. Tr. 233:4–13, 245:9–21; GX 500E. Members of Sev Side/DOA gained respect and status within the gang by engaging in fraud and contributing the proceeds to the gang and by committing acts of violence against members of other gangs. Tr. 298:24–299:4, 300:18–20. Among other things, members of Sev Side/DOA would travel together to rival gang territories to shoot at rival gang members, a practice they called "spinning" the block. Tr. 391:7–12.

The Section 1959 and 924(c) charges of which Perez was convicted were based on Perez's participation in an attack on November 10, 2021, in RPT territory. The Government proved Perez's involvement in the attack through video evidence, images recovered from Perez's phone, and the testimony of a cooperating witness, Vance Brockington ("Brockington").

---

[1] The Government did not proceed at trial on Count 3 of the Indictment. *See* March 20, 2025, Minute Entry.

The video evidence consisted of a compilation of security camera footage from the night of the shooting capturing the vicinity around 4646 Park Avenue and River Park Towers, where the shooting occurred. See GX 2106. In the surveillance video, an individual recognizable as Perez exits a gray sedan around 1:27 a.m.[2] and enters 4646 Park Avenue, where he greets EJ and Nick Saint, who have been waiting in the lobby. Id. Perez is wearing a camouflage jacket with a patch on the left arm, and EJ is wearing bright blue clothing. Perez pulls the two other men into a huddle before leading them outside and into the gray sedan fifteen minutes later. The same car is seen approximately forty-five minutes later in the vicinity of the River Park Towers. Tr. 608:1–2, 608:17–23, 634:9–20, 638:17–20. The car makes a right turn onto Matthewson Road and slows down. As the car is slowing down, a man wearing the bright blue clothing, whom the jury could have inferred was EJ, stands up through the car's sunroof and fires gunshots at three people standing in front of a building. See GX 2208. The car then races from the River Park Towers in the direction of 4646 Park Avenue, where it arrives minutes later. The same three individuals who entered the car exit it and enter 4646 Park Avenue with a fourth man later identified as Devon Mason. The four walk down a hallway at the River Park Towers toward an

---

[2] The Government's witnesses, Detectives Masker and Cserenyi, explained the time stamps on the videos. Detective Masker is assigned to the 46th Precinct in the Bronx and assisted with the investigation of the RPT shooting. Tr. 496:9–497:5. As part of his work on the investigation, he downloaded surveillance video from 4646 Park Avenue. Tr. 497:6–8. When downloading the videos, Detective Masker noted that "the date was correct, but the timing was an hour ahead of real time" in GX 2101A–2101C, 2101F–2101J, 2101M, and 2101N. Tr. 599:11–16. Detective Cserenyi works for the Technical Assistant Response Unit ("TARU"), where he is a video technician. Tr. 591:8–592:7. In this role, he is responsible for collecting surveillance videos from cameras across New York City, as well as installing and maintaining the camera boxes. Id. When he is tasked with collecting surveillance, he documents the accuracy of the date and timestamps. Tr. 593:7–20. Cserenyi collected the surveillance videos from the night of November 10, 2021, at 4646 Park Avenue. Tr. 594:5–7. Cserenyi noted that the dates on the videos were correct, but the timestamps were seven minutes too fast in GX 2101D, 2101E, 2101K, and 2101L. Tr. 595:12–18. The Court will refer to the times as explained by the Government's summary witness, Malcolm Hanchet. See Tr. 597–608, 632–651.

apartment belonging to Meech, which Brockington, the cooperating witness, testified was the headquarters of Sev Side/DOA. *See* Tr. 267:14–18, 269:4–14.

Officer Sanchez-Ramirez was on duty in a marked police car adjacent from the River Park Towers on November 10, 2021. She testified that she saw a gray BMW circle the area around the River Park Towers three times before she heard multiple shots. Tr. 585:3–11.

Brockington was a fellow gang member and a cooperating witness. Brockington has known Perez since Perez was about thirteen or fourteen years old, and he saw Perez two to three times per week from the time they met until Perez's arrest. Tr. 235:19–236:5. He explained that RPT is one of Sev Side/DOA's rivals, and that the conflict began because members of both gangs—including Perez—made music about the other gang's "dead friends." Tr. 245:23–247:7. The conflict later turned into actual violence between the two gangs and their allies. Tr. 247:8–20.

Brockington testified that Sev Side/DOA members gain respect or positions of authority in the gang by accumulating money or perpetrating acts of violence against rival gang members. Tr. 198:22–199:3, 300:18–20, 393:9–18. Brockington testified that Perez belittled gang members who did not contribute money and that Perez once said to another gang member, "[I]f you're not doing any shootings or getting any type of money, what you around me for?" Tr. 375:22–376:5. The money that members contributed would be used to purchase clothing and guns, to rent cars to use in shootings, and to rent AirBnbs for shooting music videos and throwing parties. Tr. 373:18–374:4, 374:7–10.

Brockington testified that Meech's apartment—Apartment 1H of 4646 Park Avenue—is the Sev Side headquarters. Tr. 267:14–18, 269:4–14. The apartment is "where the firearms are, where [gang members] chill and smoke." Tr. 269:15–17, 388:18–21.

Brockington testified that he was aware that Perez was involved in the RPT shooting. Tr. 425:3–12. Brockington was in Meech's apartment at 4646 Park Avenue smoking or about to smoke when Perez came in and said something to the effect of "my shit still hot, but the son was too fast." Tr. 426:1–11. Perez was joined by EJ and a third person whose name Brockington did not recall. Tr. 426:16–21. Brockington testified that the "hot" item was a firearm, which Perez was holding. Tr. 426:25–427:7. The "son [who] was too fast" was the rival gang member from RPT that the group was trying to shoot. Tr. 427:14–21. Brockington also testified that he had seen the gun fully loaded two to three days before the shooting, that Perez showed him the clip after the shooting, and that when Perez returned to Meech's apartment, there were not as many bullets in the clip as he had previously seen. Tr. 427:23–428:15. Perez told Brockington that they committed the shooting because rival gang members kicked over candles at the memorial of a deceased friend. Tr. 428:16–429:5.

Brockington identified the individuals captured in the videos. He identified the individual wearing camouflage as Perez (Tr. 226:13–21; GX 2204), the individual wearing blue as EJ (Tr. 229:20–25; GX 2206), the third individual at 4646 Park Avenue as Nick Saint (Tr. 230:9–23; GX 2207), and the individual wearing black as Devon Mason a/k/a BJ (Tr. 201:20–202:3, 229:2–7; GX 2205).

Videos from Perez's phone on November 10, 2021, corroborate the surveillance footage and Brockington's testimony. The videos depict Perez displaying multiple firearms while wearing the same clothing as the individual in camouflage who rode in the gray sedan from 4646 Park Avenue to the River Park Towers and back. *See* GX 402-1, 402-1A, 402-1B, 402-1C. Perez sent a message on his phone on November 12, 2021, stating: "I was in rpt playing that," followed by a party emoticon. GX 402-3. There was evidence at trial that "party," in gang

vernacular, meant "shooting," Tr. 806:23–807:3, and that Perez had used the party emoticon elsewhere to signify the commission of a shooting, *see* GX 2406. Also on November 12, 2021, Mason and Perez were stopped by members of the Yonkers Police Department in a car driven by Mason, and Perez was found to be in possession of a firearm. Tr. 656:13–664:1.

## DISCUSSION

Perez argues that there is insufficient evidence to convict him of Counts Four and Five of the Indictment. Dkt. No. 234.

Federal Rule of Criminal Procedure 29 provides that "on the defendant's motion" a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "[A] defendant challenging the sufficiency of the evidence that led to his conviction at trial bears a heavy burden as the standard of review is exceedingly deferential" to the jury's verdict. *United States v. Zhang*, 135 F.4th 44, 49 (2d Cir. 2025) (citing *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)). As the Second Circuit has explained, "In reviewing whether a conviction is supported by sufficient evidence, [a court must] 'sustain the jury's verdict if, crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Pollok*, 139 F.4th 126, 134 (2d Cir. 2025) (quoting *United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022)). Consequently, "[a] judgment of acquittal can be entered 'only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)); *see also United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) ("If the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the

matter." (cleaned up)). By contrast, "if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted." *United States v. Temple*, 447 F.3d 130, 137 (2d Cir. 2006) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)). "[T]he evidence must be viewed in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)), "since one fact may gain color from others," *United States v. Berry*, 2022 WL 1515397, at *3 (S.D.N.Y. May 13, 2022) (quoting *United States v. Tramunti*, 500 F.2d 1334, 1338 (2d Cir. 1974)).

Section 1959 of Title 18 makes it unlawful for a person "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, [to] . . . murder[] . . . or attempt or conspire[] so to do" in violation of the laws of any state or of the United States. 18 U.S.C. § 1959(a). In order to establish a violation of Section 1959, the Government is "required to prove beyond a reasonable doubt: (1) [the existence of] a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992). A defendant who does not himself commit an attempted murder can be held liable for attempted murder in aid of racketeering activity (and other violent crimes in aid of racketeering) on a *Pinkerton* or aiding and abetting basis. *See United States v. Houston*, 648 F.3d 806, 818 (9th Cir. 2011); *see also United States v. Tse*, 135 F.3d 200, 206–07 (1st Cir. 1988) (holding that the mens rea element of Section 1959 is met when a defendant enters into the conspiracy to commit a crime

7

of violence for the purpose of gaining entrance to or maintaining or increasing his position in a RICO enterprise).

As relevant here, Section 924(c) of Title 18 makes it unlawful to use or carry a firearm "during and in relation to any crime of violence" or to possess a firearm "in furtherance of any such crime." 18 U.S.C. § 924(c); *see United States v. Morris*, 61 F.4th 311, 316 (2d Cir. 2023) ("A defendant can be convicted under 18 U.S.C. § 924(c) only if 'during and in relation to any crime of violence or drug trafficking crime' he 'use[d] or carrie[d] a firearm, or . . . , in furtherance of any such crime, possesse[d] a firearm.'" (quoting 18 U.S.C. § 924(c)(1)(A) (emphasis omitted)). "[A] crime of violence is a felony that 'has as an element the use, attempted use, or threatened use of physical force against the person or property of another.'" *Morris*, 61 F.4th at 316 ((quoting 18 U.S.C. § 924(c)(3)(A)).[3] "To determine whether an offense is a crime of violence under [§ 924(c)(3)(A)], courts employ what has come to be known as the categorical approach." *United States v. Pastore*, 83 F.4th 113, 118 (2d Cir. 2023) (quoting *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018)). Under this approach, courts do not look at the specific facts of the case at hand; rather, courts "identify the minimum criminal conduct necessary for conviction under a particular statute by looking only to the statutory definitions—i.e., the elements of the offense." *Id.* (citations and internal quotation marks omitted). "Since attempted murder requires both an intent to use physical force and a substantial step toward the use of physical force, it satisfies the 'attempted use . . . of physical force' element under section 924(c) . . . and thereby qualifies as a

---

[3] Prior to 2019, a crime of violence was also defined by the so-called "residual clause," 18 U.S.C. § 924(c)(3)(B), which states that "a crime of violence is a felony 'that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.'" *United States v. Morris*, 61 F.4th 311, 316 (2d Cir. 2023) (quoting 18 U.S.C. § 924(c)(3)(B)). The Supreme Court invalidated the residual clause as unconstitutionally vague in *United States v. Davis*, 588 U.S. 445, 469 (2019).

crime of violence." *United States v. Padilla*, 728 F. Supp. 3d 317, 322 (S.D.N.Y. 2024) (quoting *Pastore*, 83 F.4th at 121).

A defendant who does not personally carry or brandish a firearm can still be held liable under Section 924(c) under an aiding and abetting theory of liability or under a *Pinkerton* theory of liability. *See United States v. Masotto*, 73 F.3d 1233, 1239 (2d Cir. 1996); *see also United States v. Young*, 561 F. App'x 85, 92 (2d Cir. 2014). The Government need not have proven Perez's guilt on both theories. It is sufficient that the evidence would support the jury verdict on either theory. *See Masotto*, 73 F.3d at 1241; *United States v. Vasquez*, 672 F. App'x 56, 60 (2d Cir. 2016) (affirming Section 924(c) conviction on *Pinkerton* grounds); *United States v. Lloyd*, 631 F. App'x 45, 49 (2d Cir. 2015) (same); *United States v. Ward*, 505 F. App'x 18, 23 (2d Cir. 2012) (same).

Under a *Pinkerton* theory of liability, a defendant may be found "guilty of a substantive offense that he did not personally commit if it was committed by a coconspirator in furtherance of the conspiracy, and if commission of that offense was a reasonably foreseeable consequence of the conspiratorial agreement." *United States v. Gershman*, 31 F.4th 80, 99 (2d Cir. 2022) (quoting *United States v. McCoy*, 995 F.3d 32, 63 (2d Cir. 2021)). "For a substantive offense taken by a coconspirator to be reasonably foreseeable, it must be 'a necessary or natural consequence of the unlawful agreement.'" *Id.* (quoting *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007)). "Whether a particular substantive crime is foreseeable and in furtherance of the conspiracy is a question of fact to be decided by the jury." *Masotto*, 73 F.3d at 1241.

"[A] defendant may be convicted of aiding and abetting a given crime where the government proves that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to

contribute to the success of the underlying crime." *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006) (quoting *United States v. Hamilton,* 334 F.3d 170, 180 (2d Cir. 2003)). The Government "need not show that he knew all of the details of the crime, so long as the evidence shows that he 'joined the venture, [that he] shared in it, and that his efforts contributed towards its success.'" *Id.* (quoting *United States v. Wiley,* 846 F.2d 150, 154 (2d Cir. 1988)). "In proscribing aiding and abetting, . . . Congress used language that comprehends all assistance rendered by words, acts, encouragement, support, or presence." *United States v. Delgado*, 972 F.3d 63, 74–75 (2d Cir. 2020) (quoting *United States v. Rosemond*, 572 U.S. 65, 73 (2014)). It is necessary only that the Government prove (1) "the defendant's efforts contributed towards [the] success of the crime, even if only at the margins" and (2) "the assistance rendered by a defendant has contributed to the success of 'the specific underlying crime' for which the defendant is charged with aiding and abetting." *Id.* (quoting *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996)). With respect to Section 924(c) in particular, it is not sufficient for the Government to show merely that the defendant knew that a firearm would be used or carried. "[T]he language of the statute requires proof that he performed some act that directly facilitated or encouraged the use or carrying of a firearm." *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994).

  The evidence easily satisfies the Rule 29 standard for both Counts Four and Five. With respect to the Section 1959 charge, Perez does not dispute that Sev Side/DOA operated as a RICO enterprise, that the enterprise was engaged in racketeering activity under RICO, or that he had a position in the enterprise. The evidence before the jury demonstrated that Sev Side/DOA committed multiple acts of violence and fraud and that Perez was a leader of the organization. He claims only that the evidence did not demonstrate that he was the shooter in connection with

the November 10, 2021, shooting and that, in the absence of evidence that he brandished and discharged a weapon, he cannot be convicted either of a violent crime in aid of racketeering or of the use and carrying of a firearm in connection with a crime of violence.

The Government did not have to prove, however, that Perez was the shooter for the jury to find him guilty of the Section 1959 violation. The evidence supported that Perez agreed in advance that he, EJ, Nick Saint, and Devon Mason would commit an attempted murder in aid of racketeering, that EJ in fact personally committed the act, and that it was reasonably foreseeable and the necessary or natural consequence of the agreement that murder be attempted. Perez was no mere bystander to the November 2021 shooting or just a companion to the shooter. He had a motive and an interest in the attempted murder. The evidence established that members of Sev Side/DOA maintained and enhanced their position in the enterprise through acts of violence against rival gang members. The evidence also showed that EJ and Nick Saint were awaiting Perez's arrival, that he led them to the gray sedan, that the car circled the River Park Towers three times before slowing and before EJ stood up in the sunroof and fired shots unprovoked, and that Perez returned to Sev Side/DOA headquarters and bragged that his "shit was still hot," referring to a firearm. From that evidence, it was no leap for the jury to find that Perez formed the unlawful agreement with the others to commit the attempted murder and that the attempted murder was therefore foreseeable.

Even apart from *Pinkerton* liability, there was sufficient evidence for the jury to convict on an aiding and abetting theory. The jury could infer from the foregoing evidence that Perez encouraged and importuned EJ to commit the shooting and that by contributing a vehicle and a firearm his assistance contributed to the success of the venture.

11

The same evidence also supported *Pinkerton* and aiding and abetting liability on the 924(c) count. Perez had the interest and motive in committing an attempted murder at River Park Towers. The jury could infer that when Perez picked up EJ and Nick Saint at 4646 Park and escorted them to the gray sedan, he did so as part of a prearranged plan to "spin" the RPT territory and shoot at rival gang members, and that an integral part of the plan was that the Sev Side/DOA gang members would possess a firearm. The surveillance video showing Perez being dropped off at 4646 Park Avenue, where EJ and Nick Saint were waiting for him, indicates Perez's role in orchestrating the shooting. Perez puts his arms around the men, suggesting that he has some level of authority over them. A jury could infer that Perez pulled the men into a huddle to instruct them about the evening's plan—to shoot at members of RPT. That inference would only be strengthened by the actions of the sedan in circling the River Park Towers three times before EJ fired his shots and by Perez's words upon the return from the River Park Towers, both at Sev Side/DOA's headquarters in Meech's apartment and by text. From the fact that the car slowed down, the jury could infer the deliberate nature and pre-planning of the shooting—even if only moments before the shooting took place. But Officer Sanchez-Ramirez's testimony that the gray sedan circled around the River Park Towers made clear that the planning happened *at the latest* when the passengers decided to make a second lap around River Park Towers. Perez does not claim that the shooting was spontaneous or unplanned; the three men who were the targets were standing and talking. There was no basis to believe that they suddenly provoked an attack.

The jury could further infer that Perez provided substantial assistance to the shooting, both through words of encouragement—for example, by pulling EJ and Nick Saint into a huddle—and through more tangible actions, such as providing the firearms that he was seen with on the day of the shooting and thereafter and that he boasted had been used in the shooting. *See*

12

*Pipola*, 83 F.3d at 565; *United States v. Jie,* 17 F. App'x 28, 31 (2d Cir. 2001); *United States v. Rahman*, 166 F.3d 1202 (2d Cir. 1998) (summary order).  Perez even noted to Brockington after the shooting that "[his] shit [was] still hot," in apparent reference to the gun that Perez was holding.  Tr. 426:9–427.  The jury could have reasonably inferred from this testimony that Perez supplied his own gun to be used in the shooting.

## CONCLUSION

The motion for a judgment of acquittal is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 234.

SO ORDERED.

Dated: August 4, 2025
      New York, New York

_____
              LEWIS J. LIMAN
           United States District Judge