

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 2, 2025

**BY ECF**
The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States* v. *Kevin Perez*, 23 Cr. 99 (LJL)

Dear Judge Liman:

    From 2020 to 2021, defendant Kevin Perez was the leader of a violent street gang. Originally known as "Sev Side," the defendant used his influence to transform the neighborhood gang into a highly visible, influential, and violent entity. He added the moniker "DOA," which stood for "Dumping on" (shooting) "Anything," or "Dead on Arrival." He unleashed the motto "Everybody Killer," or "EBK," to reflect Sev Side/DOA's violent transformation under his leadership. And he backed up his words with action. Over the course of less than 18 months, the defendant and his fellow gang members engaged in a campaign of violence, deepening existing gang rivalries and instigating new feuds where none had previously existed. Dozens of people were shot at, injured, and even killed during this short period of time, due to the increased gang violence whipped up, in large part, by the defendant. Not only did the defendant shoot at people himself, he also goaded others into becoming "shooters," thereby endangering the lives of people living in his own community—all to increase his own fame, fortune, and status in the gang world. In doing so, he robbed families of their sons, brothers, and fathers.

    Consistent with the calculation in the July 30, 2025 Presentence Investigation Report ("PSR"), the defendant faces an aggregate recommended sentence under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") of 50 years' imprisonment. The U.S. Probation Office recommends that the Court impose that sentence. For the reasons set forth below, the Government agrees that a sentence of 50 years' imprisonment would be sufficient, but not greater than necessary, to satisfy the purposes of sentencing. Such a sentence is needed to account for the egregious nature of the defendant's conduct, the extent of the harm he inflicted on those around him, his history and characteristics, and the need to promote respect for the law, to protect the public, to afford adequate deterrence, and to provide for just punishment.

Hon. Lewis J. Liman  Page 2
December 2, 2025

I. **Background**

As the Court is aware, after hearing seven days of evidence in March 2025, a jury convicted the defendant of three counts: racketeering conspiracy, assault with a dangerous weapon and attempted murder in aid of racketeering, and a firearm discharge offense based on the violent crime in aid of racketeering. (*See* Dkt. No. 231 (verdict form)). The jury found the defendant not guilty of murder in aid of racketeering, after the defense acknowledged that the defendant shot and killed Hwascar Hernandez on December 16, 2021, but argued that the defendant did so in self-defense. (*Id.*; *see, e.g.*, Trial Tr. ("Tr.") 1494 (defense summation)).

A. **Offense Conduct**

The evidence at trial established that Sev Side/DOA is a gang based in the vicinity of East 187th Street in the Bronx, primarily between Park and Crotona Avenues, with its headquarters located at 4646 Park Avenue. (*See, e.g.*, PSR ¶ 30; Government Exhibit ("GX") 500A; Tr. 195, 267–69 (CW-1)). The defendant did not start the gang; in his interview with the Probation Office, he acknowledged that he joined "Sev Side" when he was 13 years old, which would be approximately 2016. (PSR ¶ 159). By 2020, he became one of the gang's most prominent public figures and the gang's de facto leader, playing a key role in transforming the gang into its violent form, Sev Side/DOA. (PSR ¶ 37; Tr. 283–84, 448 (CW-1)).

In early May 2020, the defendant created his Instagram account, Kayflockaa, which he used to promote his music and his membership in the gang, as well as to promote violence against gang rivals. (GX 2300A; *see also* PSR ¶ 40). Later in May 2020, the defendant published on YouTube his first music video, titled "FTO" (Tr. 291 (CW-1)), presumably meaning "Fuck the Opps." The opening shots of the music video show the entrance of 4646 Park Avenue, where the unofficial headquarters of Sev Side/DOA was located, lined with members of the gang, with the defendant in the middle spraying champagne:



Hon. Lewis J. Liman                                                                                                    Page 3
December 2, 2025

(GX 602; Tr. 294-298 (CW-1)).

The lyrics make the gang connection explicit. The song opens with: "Gang with me, Flockas with me, the Goons with me, got the Rey with me." (GX 602-T). "Flockas," which means "shooters," is the word members of Sev Side/DOA used to refer to themselves—for example, the defendant's street name was "Kay Flock," and his Instagram usernames were "Kayflockaa" and "Kay.flocka"—and "Rey" likely referred to Reyway, a nearby gang that was allied with Sev Side/DOA. (Tr. 298, 224-225 (CW-1), 772 (CW-2)). The defendant then uses the rest of the song to rap about the violence he and others have and will visit on their gang rivals, including the gang at River Park Towers ("RPT"). (*See, e.g.,* 602-T ("When we spin through the T's, if I don't got the gun, throw him right in the Hudson")).

Despite Perez's young age, he quickly became the face of Sev Side/DOA. Over the course of the summer of 2020, Perez used Instagram to increase his clout by promoting his membership in Sev Side/DOA, to antagonize rival gangs, and to establish his status as a shooter within the gang. At the end of May 2020, he posted a story with the caption "Don't give a fuck wat he jacking IK EBK when im toting that weapon," stating that he was "EBK," or "everybody killer," when he had his gun with him. (GX 2303). Perez frequently posted public pictures and stories of himself wielding guns while insulting rival gangs. For example, in May 2020, he posted a story of himself waving a gun with the caption "slide thru your block ima empty the glizzy," broadcasting that he would go and shoot up rival gang members in rival gang territory. (GX 2321, GX 2321A).



In July 2020, he posted a picture of himself holding the butt of a gun while an associate made the Sev Side gang sign with one hand and with the other hand made a gesture that was intended to insult a rival gang called the Drillys. (GX 2309). In addition to these posts and stories, in which Perez taunted rival gangs, Perez also utilized Instagram Live to antagonize rival gangs, and sometimes to argue directly with members of those rival gangs to



further insult them and raise the defendant's profile. These posts, as well as the exhibits offered into evidence at trial, are just a small sample of the numerous posts that Perez made to publicize his own membership in Sev Side/DOA, to advertise his willingness to commit violence, and to provoke rivals.

The defendant's promotion of violence did not end at making social media posts that glorified the gang violence that he rapped about in FTO. Perez knew that if he wanted to be respected as a drill rapper, he needed to live what he rapped—that is, actually commit violence.

Hon. Lewis J. Liman  Page 4
December 2, 2025

(Tr. 287 (CW-1), 773 (CW-2)). Perez built his reputation as a serious drill rapper and as a serious gang leader in the summer of 2020 by instigating and committing shootings.

At trial, the Government established the defendant's role in three shootings that took place over the span of just two months in 2020.

On June 20, 2020, the defendant, along with three other members of Third Side, a gang that was allied with Sev Side/DOA, in two separate cars, drove to the nearby territory of their gang rivals, the 800 YGz or the "800s." Shortly before 5 a.m. while a small crowd of people were gathered outside a building that was associated with the 800s, Michael Gant, who was part of the allied Third Side gang, ran up to a group of individuals standing in front of the building and opened fire.[1] (PSR ¶ 42; Tr. 938–41, 46 (Julien)). Gant pursued the group into the building's lobby, while continuing to shoot, as the group tried to run for cover. (GX 4101A and B). Four individuals were shot, including "Ely," the "face" of the 800s, who was shot in the jaw. (PSR ¶ 43; Tr. 783 (CW-2); GX 4103, 4105). A member of a gang allied with the 800s was struck by a bullet in the leg, and two minor girls who were present—one of whom was in a relationship with Ely—were also hit by bullets, with one struck in the leg and the other suffering a graze wound to her shoulder. (*See* Tr. 806 (CW-2), 940 (Julien)).

Perez did not pull the trigger during this shooting, but he undoubtedly aided and abetted the shooting. In the hours and days following the shooting, the defendant sent text messages to his friends, bragging about the shooting that he had done with the others. In one such message, the defendant boasted: "we just made 2 movies on the 8," which referred to committing acts of violence against the 800s. (GX 401-8; Tr. 391 (CW-1), 806 (CW-2)). The defendant also wrote in text messages that the group had "2 chops"—that is, two guns—which belonged to the defendant and "Zay," referring to Iszayah Rowson, a leader of the allied Third Side gang.[2] (GX 401-4). In addition to flaunting hitting Ely in the face, Perez also bragged about hitting the two minor girls, noting in another message to a friend that they also shot Ely's "bitch." (*Id.*; GX 401-8).

As a result of the defendant's and his allies' actions, members of the 800s went to Third Side to retaliate. (Tr. 794 (CW-2)). The 800s gang members fired shots but failed to hit anyone. (Tr. 794–95 (CW-2)).

---

[1] Gant was charged and ultimately pleaded guilty in connection with his participation in the shooting in connection with racketeering-related charges against members of the Third Side gang. *See United States v. Rowson and Gant*, 22 Cr. 310 (PAE). The Hon. Paul A. Engelmayer sentenced Gant principally to 192 months' imprisonment.

[2] Rowson was charged alongside Gant and also pleaded guilty in connection with his participation in the shooting. *See United States v. Rowson and Gant*, 22 Cr. 310 (PAE). Judge Engelmayer sentenced Rowson principally to 168 months' imprisonment.

Just two days later, on June 22, 2020, the defendant posted on Instagram a story of himself sitting in the rear passenger seat of a car driving through the territory of the Drillys, a rival gang. The defendant showed the butt of a gun sticking out of his pants pocket, broadcasting that he was armed and ready to shoot at Drillys. (GX 2330).



Then on June 26, 2020, the defendant went on Instagram Live to antagonize members of the Drillys, telling the Drillys that he (the defendant) was outside and that they should "pull up" to Sev Side/DOA territory. (Tr. 381–82 (CW-1)). Not long after, just as the defendant had taunted the rival gang to come shoot at him, a car drove to the front of 4646 Park Avenue, the known headquarters of Sev Side/DOA, and shot at the people gathered outside the building on that warm summer night. CW-1, a member of Sev Side/DOA, was shot in the stomach. (PSR ¶ 47; Tr. 267, 377–79 (CW-1)). The defendant was still in the area at the time of the shooting, and he shot back, though failed to hit anyone. (GX 2357 at 3.)

While CW-1 was in the hospital, the defendant told him, in substance, "you know I got you," which CW-1 understood to mean that the defendant would retaliate. (PSR ¶ 48; Tr. 379–80 (CW-1)). CW-1 responded "play ball," meaning that the defendant should retaliate. (Tr. 380 (CW-1)).

About three hours after the shooting, Sev Side/DOA members Nicholas Johnson and Philip Santiago walked into an apartment building at 2311 Tiebout Avenue, where the defendant and others greeted them. (PSR ¶ 49; GX 3102, 3201, 3202; Tr. 227, 231 (CW-1)). About an hour later, Johnson and Santiago emerged, wearing sweatshirts and coverings on their heads. Johnson and Santiago then got on a motorized scooter, drove to the vicinity of East 194th Street and Valentine Avenue—the heart of Drilly territory—and fired at a group of people standing on the street, before returning to 2311 Tiebout Avenue. (GX 3104). An 18-year-old woman was struck by a bullet, which lodged in her right cheek. (Tr. 1002 (Caltabiano)).[3]

About an hour after Johnson and Santiago's retaliatory shooting, the defendant sent an Instagram message to another Sev Side/DOA member that stated "N**** Nick and PJ just made

---

[3] Johnson pleaded guilty in connection with the shooting before this Court, who sentenced Johnson principally to 150 months' imprisonment. In 2021, Santiago pleaded guilty to a felon-in-possession count before Judge Nathan in connection with the shooting, and was sentenced principally to 57 months' imprisonment. *See United States v. Santiago*, 20 Cr. 528 (AJN).

Hon. Lewis J. Liman                                                                                                    Page 6
December 2, 2025

a movie," meaning that Johnson and Santiago (who went by the name "PJ") committed the shooting. (PSR ¶ 50; GX 2355; Tr. 391 (CW-1), 806 (CW-2)).

This episode, where the defendant's own friend was shot in the stomach and severely injured because the defendant had taunted a rival gang, did nothing to deter the defendant.

Two days later, on June 28, 2020, the defendant and three others filmed a rap video for a song titled "Who Really Buggin'," in which the defendant and Rowson (who was also present during the June 20, 2020 shooting), published a song boasting about their shooting of Ely and the others. Perez, in particular, taunted that they had put a "hole in his face, that boy look like a dolphin" while the rest of the group yelled "Ely!" (GX 604, 604-T). The defendant promoted this music video, even though he undoubtedly understood that it would create heightened tensions between his gang (and their allies, Third Side and Reyway) and the 800s.

On August 10, 2020, the defendant was once again taunting Ely, the same "face" of the 800s who had been shot in the mouth on June 20, 2020. The defendant was on a FaceTime call with Ely, in which Ely said that he and his gang (the 800s) were outside, and the defendant said, in substance, "stay outside," and showed himself inside a car driving. (PSR ¶ 53; Tr. 812–14 (CW-2)). The defendant told Ely that he would see him "soon." Shortly thereafter, at approximately 11 p.m., two individuals ran toward a group of individuals standing in front of 2048 Mapes Avenue, which is the same building where the June 20, 2020 shooting took place. (PSR ¶ 52). Those two individuals opened fire at the group. The group attempted to run inside the building but were unable to get the door open, as the two shooters continued firing at them. (GX 4201; Tr. 1077–81 (Alvarez)). Ely was struck in the lower leg, and a 16-year-old girl was also struck in the leg. (Tr. 1077–82 (Alvarez); GX 4202). Ely required the use of a cane and a brace to walk after the shooting. (Tr. 814–15 (CW-2)). The defendant later released a song titled "DOA," in which he glamorized the shooting, rapping: "Shoot wit' double hands, that's how I got my aim / Eli got shot, he walkin' wit' a cane."[4]

This brief window into the defendant's conduct over the course of two months in summer 2020, after he released his first music video, illustrates the role the defendant took on within Sev Side/DOA. Unquestionably, the defendant participated in violence. But he wasn't just another gang member who merely tagged along with the others. The defendant instigated violence, promoted his violent lifestyle for all to see, goaded his rival gangs into committing violence, and escalated gang warfare. The defendant used his words—in his music and on social media—to create a culture of violence. And then he acted on those words.

In addition to escalating existing gang rivalries, the defendant, who popularized the acronym "EBK," for "everybody killer," was responsible for instigating new gang rivalries. The defendant started and/or deepened rivalries with, for example, River Park Towers ("RPT") in the Bronx, and the OYz of Sugar Hill in Harlem. (Tr. 246–249 (CW-1)). The defendant used his platform—on social media and through his music—to engage in rap battles with rappers from other gangs, such as RPT and the OYz. Those rap battles and public taunting increased the

---

[4] See https://genius.com/Kay-flock-doa-lyrics.

Hon. Lewis J. Liman                                                                                                    Page 7
December 2, 2025

defendant's profile on social media and increased attention to his music. But they also resulted in real-life violence that ruined lives and communities.



For example, Perez specifically called out one of the most well-known rappers associated with RPT, Edai, in his song "FTO," with the line: "Edai said he was Sevk, he on the sev, oh, he think that's Kay Flock? / No he not no he not." (GX 602-T). It was a taunt directed to Edai and RPT: if they did not want to be belittled, they needed to come to Sev Side/DOA and commit violence. (Tr. 780 (CW-2)). In his own private messages, the defendant admitted to "spinning" the "Ts," referring to RPTs, because they had "spinned [his] shit." (*See* GX 2361 at 2).



Perez also seized on the popularity of Edot Baby, the most well-known rapper associated with the OYz, and posted a picture of himself pointing a gun at the camera while playing Edot Baby's song. The message is clear. The defendant and Sev Side/DOA have made Edot Baby and the OYz another target.

In May of 2021, the defendant signed with a music label, Capitol Records. (PSR ¶ 172). The music that had glorified gang violence made the defendant famous and now rich. And the defendant kept going. He kept making music about his gang rivalries and gang violence, and he kept committing shootings, knowing that he needed to do so in order to maintain his street cred. Throughout the summer of 2021, Perez released a number of new songs, heaping insult on rival gangs, the list of which continued to climb. For example, in "Is Ya Ready," the defendant made fun of a rival gang member known as "Dubski," who was murdered by a member of a gang allied with Sev Side after Dubski tripped while running away after he was shot in the foot. (GX 603A-T ("Don't run, don't trip, like Dubski"); Tr. 822–24 (CW-2)).[5] In the same song, the defendant ran through a litany of his rivals: OYz ("Edot Baby, that kid ain't on nothin'"); the 800s ("Bitches get shot, it get heavy / like with Nesty / my .45 hold six throwin' deadies / Where his bestie (Rah Rah) / In the ground, LVK, he with Mexi"); and a gang associated with the Lambert Houses in the Bronx ("LVK, he with Mexi"; "Catch an LV, put him on his neck (LVK)"). (GX 603A-T; https://genius.com/Kay-flock-is-ya-ready-lyrics). In this one song, the defendant did not just rap generally about his various gang rivalries, but he rapped about specific victims of gang violence, many of whom— such as Dubski, Rah Rah, and Mexi—were murdered. Whether the defendant pulled the trigger

---

[5] The video of Dubski's execution, published by news media accounts, is chilling. *See* https://nypost.com/2020/09/13/video-bronx-gun-fight-ends-in-execution-style-killing/

himself or not, by rapping about these murders, he was glamorizing deadly gang violence, making the murderers famous. Dubski was 17 years old when he was killed. Rah Rah was 16 years old.

The defendant's stance on violence was not just for show. Even in private messages to his fellow Sev Side/DOA members and to his allies, the defendant urged those in his circle to commit more violence. The defendant belittled those Sev Side/DOA members who he viewed as not contributing to the gang, asking them, in sum and substance, "if you not doing no shootings or getting any type of money, what you around me for?" (Tr. 376 (CW-1)). The defendant sent a barrage of messages to C Blu, a member of the allied Rey Way gang, criticizing him for not "coming outside" to "do[ ] shit" (that is, to commit violence) until 2021, and for having "no hits" (that is, no shootings) (GX 2414-72; Tr. 282–283 (CW-1)). These messages show that the defendant's incitement of gang violence was not just a public persona he played.

There were real costs to the defendant's provocation. In addition to the murders of gang rivals, Sev Side/DOA also suffered losses. In July 2021, a 13-year old member of Sev Side/DOA, known as "Jay Rip," was murdered on the street in broad daylight. In September 2021, a Sev Side/DOA member known as "Nas"—who was 16 years old—was murdered by 800s member CW-2 and others. (Tr. 853, 859-60 (CW-2)). By this time, the defendant knew that federal law enforcement officers were investigating him. He said so in his songs ("I know that the feds tryna lock me / Ridin' with it, I hope they don't stop me / If they do, then it's gon' be a high speed / I pray God take the wheel, hope he got me" (https://genius.com/Kay-flock-being-honest-lyrics)), and privately to his fellow Sev Side/DOA members (Tr. 261–62 ("Q: [W]hat if anything, did the defendant say about being watched by the feds? A. He said he doesn't care. If they come, he's going to do his time.")).



But neither knowing he was under federal investigation, nor the deadly toll of gang violence—even amongst his own friends—deterred the defendant. Hours after Jay Rip's death, the defendant posted a photo of himself with two other members of Sev Side, with the caption "Ion mean no harm but for my brothers ima kill . . . love your soul 5evaa RipK . . . yk we them gbg babies got you fashoo." (GX 2404). The defendant's reference to a popular Sev Side/DOA tagline—"gbg babies," which stands for "get back gang babies"—proved to be prescient. Hours after Perez posted this picture, Rah Rah was murdered by two juvenile members of Sev Side/DOA.[6] Yet despite these tragedies happening before his eyes, the defendant continued to antagonize and provoke. Shortly after Jay Rip and Rah Rah's death, the defendant exchanged private messages with Nesty, a member of the 800s, acknowledging that Sev Side/DOA killed Rah Rah in retaliation for Jay Rip's death, and the defendant taunted: "Rah rah mad at yu rn yu not doing nun putting

---

[6] The Bronx District Attorney prese release announcing charges related to this murder and the murder of Jay Rip is available at: https://www.bronxda.nyc.gov/downloads/pdf/pr/2021/47-2021%205-youths-8-men-indicted-teen-murders-shootings-carjackings.pdf

on nothing." (GX 2419 at 7, 10 ("That's my manssss my DOA that just got caught for thattt rah rah shit yu dick headdddd")).

In November 2021, the defendant followed through on his threats to RPT. Following what the defendant perceived to be an insult, he and several other Sev Side/DOA gang members went to "spin" at RPT. (Tr. 424–29 (CW-1)). At approximately 2:30 a.m. that evening, the defendant and the others drove to RTP territory, the River Park Towers. They circled the block two times and saw a group of men gathered outside the supermarket near the entrance to RPT. (PSR ¶ 55; GX 2106; Tr. 584–85 (Sanchez Ramirez)). Having found their targets, the defendant and the others circled the block a third time. Just as the car pulled up across from the men, Ervin Beamon, a member of Sev Side/DOA, popped out of the car and fired several shots at the group of men.[7] (GX 2104A through C, 2106; Tr. 584–89 (Sanchez Ramirez)). After the shooting, the defendant and the others drove back to 4646 Park Avenue, where Perez bragged to others about how close they had come to hitting one of the men outside RPT. (Tr. 426 (CW-1)). Perez even took out the gun that was used during the shooting and took out the magazine to show how many bullets had been used. (Tr. 427–28 (CW-1)).

Videos from the defendant's phone, which were saved down later on November 10, 2021, after the shooting, showed him displaying multiple firearms while wearing the same clothing as the clothing he wore during the shooting. (PSR ¶ 58; GX 402-1 and 402-1A through -1C; Tr. 666–71 (Reda)). Two days later, on November 12, 2021, the defendant sent a message, saying "I was in rpt playing that," followed by a "party" emoji signifying his role in the shooting at RPT. (PSR ¶ 59; GX 402-3, 2406, 2406A; Tr. 665–66 (Reda); Tr. 368–72 (CW-1)). Shortly after sending the message, the defendant was arrested by members of the Yonkers Police Department for possessing a firearm while he was a passenger in a different BMW being driven by Devon Mason, who had also driven the car during the RPT shooting two days earlier. (Tr. 657–62 (Reda)).

The following month, in December 2021, the defendant was again arguing with a rival gang member on Instagram live while socializing with other Sev Side/DOA members in 4646 Park Avenue, the gang's unofficial headquarters. (Tr. 389 (CW-1)). The defendant taunted the rivals until the rival gang came to his neighborhood to spin, causing another shootout in front of 4646 Park Avenue. (Tr. 390 (CW-1)).

Then, on December 16, 2021, the defendant shot and killed Hwascar Hernandez in OYz territory. As described above, the defendant had been in a dispute with the OYz for over a year by this point. This was not a historical gang rivalry that the defendant inherited when he joined Sev Side. Rather, the defendant instigated this rivalry. And on the morning of December 16, 2021, shortly after 9 a.m., the defendant deliberately went to enemy territory, looking for trouble. While at the park where Edot Baby shot a popular music video (*see* GX 601, 601A, 1241B), the defendant got into an argument with another individual, and said that he (the defendant) was looking for members of the OYz (Tr. 982–83 (Colon)). The defendant then walked to a nearby convenience store, where he appeared to go on Instagram Live and show off a gun in his waistband, under his coat. (PSR ¶ 62; GX 1230).

---

[7] Beamon and Mason both pleaded guilty before this Court in connection with the November 10, 2021 shooting, and were sentenced principally to 138 months' and 156 months' imprisonment, respectively.

Afterward, the defendant walked to a brownstone, and he emerged about 30 minutes later, accompanied by a woman who was later identified as Ashanti Washington. (PSR ¶ 62; GX 1101). The defendant and Washington walked back down Amsterdam Avenue, toward the park. As they walked past a barbershop on Amsterdam, which the defendant had passed several times that morning, Hwascar Hernandez walked out of the barbershop and appeared to exchange words with the defendant. (PSR ¶ 63; GX 1101). As Hernandez continued to walk toward the defendant, the defendant—who had kept his hand on his gun during the entire interaction, and while rounding the corner from Amsterdam Avenue onto West 151st Street—abruptly turned and shot Hernandez, striking him in the neck and killing him. (PSR ¶ 63; GX 1101). The defendant then fled west on West 151st Street, throwing the gun into an apartment building's trash area, where officers recovered the firearm. (PSR ¶ 63; GX 1101; Tr. 120–22 (Crawford)). While paramedics were cutting open Hernandez's clothing in an attempt to perform life-saving measures, a gun fell onto the floor of the ambulance. (PSR ¶ 63).

Immediately after he killed Hernandez, Perez fled to a house in rural New Jersey. (PSR ¶ 64). The police searched the house, looking for Perez but did not find him. (*Id.*) The following week, after news media reported that the defendant was wanted and displayed his photograph, Perez self-surrendered to the precinct on December 23, 2021. (*Id.*). In February 2023, the defendant was charged federally and brought into federal custody.

At the defendant's trial in March 2025, the defense argued that the defendant killed Hernandez in self-defense and called Washington as a witness. In substance, Washington testified that she heard Hernandez threaten to kill her and the defendant.[8] The jury found the defendant not guilty of murder in aid of racketeering, presumably concluding that the Government had not disproven the defendant's self-defense claim beyond a reasonable doubt.[9] As detailed below, the Government submits that the Court can and should consider the defendant's role in instigating the confrontation with Hernandez and the OYz, as well as his role in causing Hernandez's death, pursuant to its authority under 18 U.S.C. § 3553(a).

---

[8] In June 2025, a grand jury in this District returned an indictment charging Washington with three counts of perjury, and one count of obstruction of justice, based on her testimony at the defendant's trial. *See United States v. Washington*, 25 Cr. 287 (GBD), Dkt. No. 2. The counts are based on (i) Washington's testimony that she was not aware that the defendant had a gun that morning and had never touched the gun, despite Washington's DNA being found on multiple places on the gun; (ii) Washington's testimony, when confronted with a photograph of her making what appears to be the Sev Side/DOA gang hand sign while next to a Sev Side/DOA member, that she was not making the hand sign and did not know what the Sev Side/DOA hand sign is; and (iii) her testimony that, immediately before the defendant shot and killed Hernandez, Hernandez said that he was going to "clap" the defendant and Washington. *See id.* at Dkt. Nos. 2, 6.

[9] The Second Circuit has held that a "jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence," *United States v. Watts*, 519 U.S. 148, 157 (1997), and so long as the resulting sentence does not "exceed the statutory maximum authorized by the jury verdict" or impose "a mandatory minimum sentence . . . not authorized by the verdict." *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005).

Hon. Lewis J. Liman                                                                                                  Page 11
December 2, 2025

On March 21, 2025—the day after the jury verdict—the defendant, while in jail, sent a text message to a friend. In it, the defendant asked the other individual to post on Instagram the following message, which threatened violence on cooperating witnesses and falsely claimed that the defendant had made the Court "cry" because the defendant "beat the top count":

> I BEAT THE TOP COUNT I MADE THE JUDGE CRY
>
> "HE SAID NOW HE NOT FORCE TO GIVE ME LIFE"
>
> AL HUMDIDILA EVERYTHING GOOD NOT GOOD
>
> AND EVERYTHING BAD NOT BAD
>
> JUST GOTTA STAY HUMBLE TILL THE OUTCOME OF YUR
>
> SITUATION AND SEE WHAT ALLAH GOT FOR YOU
>
> CHIN UP CHEST OUT SHIT AINT OVER NO WERE NEAR!!!
>
> REMAIN A G AND STAY SUCKA FREE
>
> NEVER FOLD NEVER WILL FREE THE THERLBREAD [sic] ONES
>
> KILL ALL RATS!!!!

( USAO_082462). Shortly after Perez sent this message, his Instagram account posted a story with the same message:



Hon. Lewis J. Liman                                                                                                  Page 12
December 2, 2025

### B. Guidelines Calculation

In the PSR, the Probation Office determined that the defendant faces an advisory Guidelines sentence of 50 years' imprisonment, which includes a mandatory minimum sentence of ten years' imprisonment, which term must be imposed to run consecutively to any other term of imprisonment imposed. The Government agrees with the PSR's Guidelines calculation.

Specifically, the PSR found that, for Count One (racketeering conspiracy, in violation of 18 U.S.C. § 1962(d)), the applicable Guideline is U.S.S.G. § 2E1.1. (PSR ¶ 80). That Guideline provides that the base offense level is the greater of 19 or the offense level applicable to the underlying racketeering activity. When the underlying racketeering activity consists of multiple offenses, each underlying offense is to be treated as if it is contained in a separate count of conviction. *See* U.S.S.G. § 2E1.1, Application Note 1. The PSR thus determined that Count One consists of nine groups, based on the underlying racketeering activities that the Government established at trial, and taking into account the Guidelines' instruction that "[c]ases involving injury to distinct victims" should be "treated separately rather than grouped together," regardless of "whether or not the injuries are inflicted in distinct transactions." U.S.S.G. § 3D1.3, Background Note. Accordingly, the nine groups are as follows:

> <u>Groups 1 through 4</u>:  Based on the four victims who were shot in the June 20, 2020 shooting in 800s territory. Because the shooting is attempted murder, U.S.S.G. § 2A2.1 applies, which provides for a base offense level of 33 because the object of the offense would have constituted first-degree murder under the Guidelines. (PSR ¶¶ 83, 89, 95, 101). Because each victim suffered serious bodily injury from their gunshot wounds, two points are added under U.S.S.G. § 2A2.1(b)(1)(B).[10] Groups One through Four thus each have an offense level of 35.
>
> <u>Group 5</u>:  Based on the June 26, 2020 shooting, in which Johnson and Santiago shot an 18-year-old woman in Drilly territory hours after a member of Sev Side/DOA was shot in the stomach. (PSR ¶ 107). Again, the attempted murder Guideline (U.S.S.G. § 2A2.1) applies, which provides for a base offense level of 33 because the object of the offense would have constituted first-degree attempted murder, and two levels are added because the victim suffered serious bodily injury. (PSR ¶¶ 107–108). The offense level for Group 5 is 35.
>
> <u>Groups 6 and 7</u>:  Based on the August 10, 2020 shooting in which Ely and a 16-year-old girl were both shot in the leg. (PSR ¶¶ 113, 119). The applicable Guideline for each group is U.S.S.G. § 2A2.1, which provides for a base offense level of 33 because the object of the offense would have constituted attempted murder, and the addition of two levels because each victim suffered serious bodily injury. (PSR ¶¶ 113–14, 119–20). Groups Six and Seven thus each have an offense level of 35.
>
> <u>Group 8</u>:  Based on the November 10, 2021 River Park Towers shooting. (PSR ¶ 125). The applicable Guideline is U.S.S.G. § 2A2.1, which provides for a base offense level of

---

[10] As reflected in the PSR, the Government does not believe the two-point enhancement for "serious bodily injury" applies to the victim who was grazed by a bullet in the arm. The defendant's total offense level (and corresponding Guidelines range) is not affected by the resolution of this dispute, however.

33 because the object of the offense would have constituted first-degree attempted murder. (PSR ¶ 125). There is no evidence that any of the targets were hit, and thus the offense level for Group 8 is 33. This group also encompasses the separate assault with a dangerous weapon and attempted murder in aid of racketeering count, which is based on the same conduct.

Group 9: Based on the defendant's bank and wire fraud, which corresponds to U.S.S.G. § 2B1.1 and, under U.S.S.G. § 2B1.1(b)(11), the offense level is 12. (PSR ¶ 131).

Under the grouping provisions, the group with the highest offense level counts as one unit, as does any other group that is between one and four levels less serious. *See* U.S.S.G. § 3D1.4(a). The group with the highest offense level is 35, and there are a total of eight units, which results in the addition of five levels, for a total of 40. (PSR ¶¶ 137–40).

Because the defendant was a leader of the Sev Side/DOA gang, which involved five or more participants, four levels are added pursuant to U.S.S.G. § 3B1.1(a). The resulting offense level for the racketeering conspiracy violent crimes in aid of racketeering counts (denoted on the PSR as Counts One and Four) is thus 44, which, under the Guidelines, is reduced to 43. (PSR ¶¶ 141–46).

The defendant has six criminal history points, which places him in Criminal History Category III and results in a Guidelines range of life for Counts One and Four. (PSR ¶¶ 150–51). Because Counts One and Four each carry a statutory maximum of 20 years' imprisonment, the defendant's Guidelines sentence on Counts One and Four is 40 years' imprisonment, pursuant to U.S.S.G. § 5G1.2(d).

Because the firearms offense count (denoted in the PSR as Count Five) carries a mandatory minimum ten-year term of imprisonment, which term must be imposed to run consecutively to any other term of imprisonment imposed, the Guidelines sentence for Count Five is ten years. (*See* U.S.S.G. § 5G1.2(a); PSR ¶ 82). Accordingly, the defendant's Guideline sentence is 50 years' imprisonment.

The Probation Office recommends a sentence of 50 years' imprisonment (20 years on Count One, 20 years on Count Four, and 10 years on Count Five, all to be imposed to run consecutively). In formulating its recommendation, the Probation Office indicated that "we have not identified any mitigating factor that outweigh the aggravating circumstances of the case" while also noting that the defendant had failed to accept responsibility. (PSR at p.40).

## II. Discussion

An aggregate sentence of 50 years, in line with the Probation Office's recommendation, is warranted and not greater than necessary to reflect the seriousness of the defendant's crimes, the defendant's history and characterizes, to afford adequate deterrence, to promote respect for the law, and to protect the community.

### A. Legal Standard

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397

F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

### B. A Sentence of 50 Years' Imprisonment is Appropriate

First, there can be no question that the defendant's actions were extraordinarily serious, and a significant sentence is needed to reflect the gravity of the defendant's actions. As set forth above, the defendant was the leader of Sev Side/DOA, and from 2020 to 2021—when he was arrested for the murder of Hwascar Hernandez—the defendant used his leadership position to remake Sev Side into a much more violent gang. To the defendant, "EBK GBG baby," or "every body killer get back gang baby," were not just words, but a principle to live by.

The defendant used his platform to escalate existing gang rivalries (such as with the Drillys and the 800 YGz) and to create new rivalries (such as with RPT and the OYz). And the defendant used his influence such that whoever he had a dispute with, Sev Side/DOA had a dispute with. He drew a generation of boys and young men to gang lifestyle. The end result of the defendant's actions—his public messages glorifying gang violence and his private messages to his associates and allies that they needed to commit violence in order gain his respect—was dramatically increased gang violence that made communities throughout the Bronx and Manhattan unsafe and took the lives of too many, including contributing to the deaths of multiple young men and boys throughout the Bronx. The defendant was not generally the person who pulled the trigger. But he conspired with his fellow gang members, aided and abetted them, provided them at times with guns, and helped perpetuate a culture that glamorized and promoted gang violence. The defendant's influence cannot be understated. His song "Is Ya Ready," in which he glorified the murders of rival gang members Dubski, Rah Rah, and Mexi, has been viewed over 113 million times. The defendant's most recent Instagram account—begun only *after* he was arrested—currently has 734,000 followers, even though he has been incarcerated the entire time the account has been active.

The defendant's actions were the direct cause of several shootings in his own neighborhood. On June 26, 2020, the defendant taunted his rivals, the Drillys, on Instagram Live, telling them where he was (4646 Park Avenue), and daring them to come and shoot at him. The Drillys took the bait. They had been publicly challenged by the defendant. The Drillys came and shot at the people gathered in front of 4646 Park Avenue—people who did not know that the defendant had just invited shooters to the gang's headquarters. One Sev Side/DOA member who was simply standing in front of the building was shot in the stomach and severely injured, requiring surgeries and long-term hospitalization. Similarly in December 2021, the defendant was again arguing with rivals on Instagram Live, telling them where he was and inviting them to come shoot. When the rivals did come, other Sev Side/DOA members engaged in a shootout. And on another

occasion, the defendant was blamed for the death of another gang member, from Courtlandt Avenue in the Bronx, because he posted on social media that he was hanging out on Courtlandt and invited his rivals to shoot, which they did. (Tr. 883 (CW-2)). Afterward, Sev Side/DOA became violent rivals with the gang from Courtlandt, one of whose members is charged in this District with murdering the defendant's friend in February 2022. (GX 2505; Tr. 218 (CW-1); *see United States v. Johnson*, 24 Cr. 706 (VM)).

The defendant was also himself involved in multiple nonfatal shootings. In his own words, the defendant admitted to being part of the crew that drove to 800 YGz territory on June 20, 2020. He also admitted to having provided one of the guns used in the shooting, which was used to shoot into the small crowd gathered in front of the 800s building, hitting Ely (an 800s member) in the face, two minor girls, and a fourth victim. Similarly, the defendant admitted, in his own words, to being present and shooting back on June 26, 2020, when Drillys responded to his provocation and came to shoot at 4646 Park Avenue. The defendant was also part of the conspiracy to retaliate that night, which resulted in an 18-year-old woman being shot in the face. On August 10, 2020, the defendant again was arguing with Ely, and told Ely that he would soon go to shoot at Ely. Shortly afterward, two individuals shot at Ely and others gathered in front of the same 800s building, hitting Ely in the foot, such that Ely needed a cane to walk afterwards. On November 10, 2021, the defendant was captured on surveillance video leaving with three other gang members to drive to RPT territory to shoot. Although another Sev Side/DOA member pulled the trigger, they used the defendant's gun, and it was the defendant who boasted about the shooting afterwards, lamenting that they were not able to hit anyone because the targets had been too fast.

And of course, it was the defendant who fatally shot Hwascar Hernandez. Regardless of whether, at the moment that he killed Hernandez, the defendant was in actual fear of his life, or whether he had a reason to believe Hernandez was about to use deadly force, there was no question that, leading up to Hernandez's killing, it was the defendant who instigated a gang rivalry with the OYz; it was the defendant who went to OYz territory to look for OYz; and that it was the defendant who was goading gang violence when he brandished his firearm while in OYz territory. The defendant went to OYz territory looking for trouble. He found it. And as a result, a 24-year old man—a father, a son, and a brother—was killed.[11]

Second, a significant sentence is necessary to reflect the defendant's history and characteristics. Although the defendant is young, he has spent his entire young life enmeshed in gang violence—committing it and promoting it. The defendant was first arrested in November 2018 for committing a robbery in the third degree. (PSR ¶ 147). Because he was only 15 years old at the time, he was adjudicated a juvenile delinquent in family court and initially placed on 12 months' probation. (*Id.*) That arrest gave Perez an opportunity to shake him from the gang life that he had fallen into. He had a difficult time at school, and so the Probation Department was going to help him enroll in a trade school. But just two months after he was placed on probation, the defendant was arrested again for stealing a car. (PSR ¶ 148). As a result, the defendant was found in violation of his probation, and in August 2019, he was sentenced to 12 months' placement in a non-secure level of care, and spent six months of that in a residential facility. (PSR ¶ 148). The defendant was likely released from the residential facility some time in late April 2020 (six

---

[11] As described above, when considering an appropriate sentence under 18 U.S.C. § 3553(a), the Court can, and should, consider this acquitted conduct and the circumstances surrounding it, by a preponderance of the evidence. *Watts*, 519 U.S. at 157; *Vaughn*, 430 F.3d at 527.

months from August 28, 2019, the date of his sentencing).  A month later, the defendant released his first music video, FTO, and a month after that, the defendant committed the first shooting that the Government is aware of.  From there, as set forth above, the defendant's profile skyrocketed—as did his penchant for violence.

Throughout 2020 and 2021, the defendant was shot at, his friends were shot at, and sometimes murdered.  The defendant was arrested, first in July 2020 for possession of a firearm, and then again in November 2021 for the possession of a second firearm.  But none of these things changed the defendant's behavior.  The defendant did not even stop openly and publicly taunting his rivals so that they felt compelled to retaliate by shooting in his own neighborhood at his own friends.   The defendant did not change his behavior because he did not want to, because he did not care about the consequences, about who got hurt in the process.  He did not change his behavior when he knew he was arrested and under indictment and when he knew he was being investigated by federal law enforcement.  Instead, he openly bragged about it.  The defendant turned all of this—the injuries his friends and foes suffered, his arrests, the federal investigation, his public disputes with rivals—into fodder for his music, into views for his music videos, and ultimately into a contract with a recording label.

That is why, even with two open gun cases, and knowing fully the toll of the gang violence that he advocated (including the deaths of his own friends and fellow gang members), the defendant nonetheless continued to carry guns illegally, nonetheless continued to provoke, and nonetheless continued to promote violence.  And the defendant nonetheless continued to commit shooting after shooting.  And, finally, in December 2021, the defendant killed 24-year old Hwascar Hernandez after going purposefully to enemy gang territory, armed, looking for rival gang members to fight and shoot.  This history reflects a defendant who brazenly defied the law for fame.

The defendant was young when he committed the offense conduct.  But so were the people whose lives he ruined, either by encouraging them to commit violence on behalf of the many gang rivalries he promoted, or by causing them to be shot.  Jay Rip, the Sev Side member who was murdered, was only 13 years old.  Hours later, two Sev Side members killed 16 year-old Rah Rah, the rival 800 YGz member, whom Perez spent specifically targeted online.  Those two Sev Side members were juveniles themselves.  Ely, the 800s member who was who was shot in the jaw and foot in the span of two months in 2020, was only 19 at the time.  When Ely was shot in the jaw, two minor girls were also hit.  The other co-defendants in this and the Third Side cases, who committed shootings with Perez, were 18 (Nicholas Johnson and Michael Gant), 20 (Iszayah Rowson), 22 (Ervin Beamon), and 23 (Devon Mason) when they committed the shootings.

The defendant's recent activities show that he has not changed.  Shortly after trial, concluded, Perez instructed a friend via text message using his tablet at the facility where he is housed to post a message to the defendant's Instagram account—which has over 700,000 followers—that celebrated his acquittal for the murder of Hwascar Hernandez ("I BEAT THE TOP COUNT"), and advocated the killing of cooperating witnesses ("KILL ALL RATS").  This was a particularly pernicious threat because the defendant's friends and followers, including well-known rapper Cardi B, had already revealed the identities and pictures of the two cooperating witnesses who had testified at Perez's trial on Instagram.

Hon. Lewis J. Liman  Page 17
December 2, 2025

<u>Third</u>, a very significant sentence is needed to promote both specific and general deterrence, to protect the public, and to promote respect for the law.

As to specific deterrence, the defendant's criminal conduct underscores the need for a sentence that protects the public from, and specifically deters, the defendant. Whether promoting and glorifying gang violence including shootings, engaging in violence himself, committing fraud, and exacerbating gang-related violence throughout the Bronx, the defendant has proven himself a grave danger to the public. Although the defendant is a young man, he has demonstrated a complete disregard for the public and the victims of his crimes for several years, committing an unbroken spree of criminality since he was a juvenile. There is nothing in the record that supports the notion that the defendant is willing to work hard to reintegrate into society. Quite the opposite. All the evidence before the Court shows that the defendant will not reform his ways absent a substantial prison sentence.

A significant sentence here is also necessary to afford adequate general deterrence among current and would-be gang members and those who would seek to glorify and commit violence on the streets of New York. The defendant's conduct over several years—committing violence and rapping about it—contributed to the scourge of gang-related criminality and gun-related violence that is currently plaguing New York City. Indeed, multiple large-scale studies reflect the toll of gang violence on our communities. For example, the FBI's 2011 National Gang Threat Assessment cites a NGIC (National Gang Intelligence Center) study that finds gangs are responsible for an average of 48% of violent crime in most jurisdictions, and up to 90% in some areas.[12] Major cities and suburban areas experience the highest levels of gang-related violence. Similarly, the National Gang Center survey analysis shows that intergang conflict and drug-related activities (all of which the defendant is responsible for) are the primary drivers of local gang violence.[13] Indeed, we understand from the NYPD that following the Government's indictments in this case and in the related case against Third Side (*United States v. Rowson*), gun- and gang-related violence fell in the 48th Precinct by over 50%. A substantial sentence of imprisonment, therefore, is necessary to send a strong message to those who, like Perez, think that committing and promoting gang violence will help propel their rap career—a message that such behavior is extraordinarily dangerous and will be severely punished. In addition, Perez's continued conduct promoting the gang and seeking violence against others, even while inside a correctional institution, deserve heightened punishment. A significant prison sentence is needed to show incarcerated defendants who are, or might be considering, engaging in similar conduct that the Court takes continued criminal conduct while in pretrial detention seriously and that such conduct is an aggravating factor that will increase a defendant's prison sentence.

IV.     **Conclusion**

The Government respectfully requests that the Court sentence the defendant to an aggregate term of 50 years' imprisonment, consistent with the Probation Office's recommendation, comprised of 20 years on Count One, 20 years on Count Four, and 10 years on Count Five, all to be imposed to run consecutively. The defendant was a uniquely positioned figure in gang culture. He fomented gang violence for fame and greed. The defendant's reckless conduct cut short young

---

[12] Available at: https://www.fbi.gov/stats-services/publications/2011-national-gang-threat-assessment
[13] Available at: https://nationalgangcenter.ojp.gov/survey-analysis/gang-related-offenses

Hon. Lewis J. Liman  Page 18
December 2, 2025

lives, and ruined others.  For that, a significant sentence is warranted, and a sentence of 50 years' imprisonment is not greater than necessary to satisfy the goals of sentencing.

          Respectfully submitted,

          JAY CLAYTON
          United States Attorney for the
          Southern District of New York

By: ___/s/_____

          Michael R. Herman
          Patrick R. Moroney
          Ni Qian
          Assistant United States Attorneys
          (212) 637-2221 / -2330 / -2364

Cc (by ECF):  All counsel of record