

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 12, 2025

**BY ECF**
The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States* v. *Kevin Perez*, 24 Cr. 653 (GHW)

Dear Judge Liman:

    The Government respectfully submits this letter in response to the defense's sentencing submission, in order to address the defense's challenges to the Probation Office's calculation of the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range.

    The Government understands the defense to be arguing that the Government has not proven by a preponderance of the evidence that: (1) the defendant is responsible for the June 20, 2020 attempted murder, the June 26, 2020 attempted murder, or the August 10, 2020 attempted murder; (2) the defendant had the requisite intent to kill for any of the underlying offenses, including the November 10, 2021 attempted murder—of which the jury convicted the defendant; and (3) there is a sufficient factual basis to find that the four-level leadership enhancement under U.S.S.G. §3B1.1(a) applies.

    As a preliminary matter, the defendant is wrong about what the Government is required to prove for the Court to consider the June 20, 2020, June 26, 2020, and August 10, 2020 attempted murders under the Guidelines. Because the defendant was convicted of racketeering conspiracy, the Court may consider the June 20, 2020, June 26, 2020, and August 10, 2020 attempted murders, in addition to the November 10, 2021 attempted murder, under U.S.S.G. § 2E1.1, even if the defendant did not himself participate in any of the attempted murders, as long as the attempted murders were reasonably foreseeable to the defendant and were racketeering activities in furtherance of the racketeering conspiracy. *See* U.S.S.G. § 1B1.3(a)(1)(B) (explicitly contemplating the inclusion of acts that were not undertaken by the defendant in the case of jointly undertaken criminal activity); *United States v. Yannotti*, 541 F.3d 112, 129 (2d Cir. 2008) (holding that a "sentencing court may consider predicate acts as relevant conduct under U.S.S.G. § 1" without specifically addressing whether the Court may consider predicate acts committed by co-conspirators other than the defendant); *see also United States v. Graham*, 123 F.4th 1197, 1285 (11th Cir. 2024) ("[Defendant] contends that the district court plainly erred in using U.S.S.G. § 2A1.1(a) to calculate his base offense level because he did not participate in a murder. It is well

established, however, that a RICO conspirator may be held accountable for his co-conspirator's actions if they were reasonably foreseeable and in furtherance of the conspiracy, even if he did not personally participate in those actions."); *United States v. Seymour*, 94 F.4th 679, 686 (7th Cir. 2024) (affirming application of murder Guideline for gang member under U.S.S.G. § 1B1.3(a)(1)(B), concluding that murder was reasonably foreseeable as part of gang membership); *United States v. Sandoval*, 6 F.4th 63, 106 (1st Cir. 2021) (concluding that gang member was responsible under Guidelines for attempted murders, where it was "reasonably foreseeable to [the defendant] that younger members would kill or attempt to kill to impress the leadership, to gain respect for themselves and to become members").

The Government easily meets that evidentiary hurdle and in fact has also proven that the defendant in fact participated in each of the three attempted murders, as set forth in more detail below.

### A. June 20, 2020 Attempted Murder

The defendant argues that there is no evidence to show that he had knowledge of the murder before it happened or otherwise participated it in it. The defendant's own words defeat this argument.

According to surveillance video of the attempted murder and the defendant's own Instagram stories, the defendant was with Michael Gant, the person who fired the shots, and "Munchie," another member of Third Side, just two hours before the shooting, in two vehicles, consistent with the two getaway vehicles used in the shootings. (GX 402, 2326, 2327, 2328, 2328A). Approximately 30 minutes after the shooting, the defendant texted another individual, "we just made 2 movies on the 8," referring to shooting at the 800s twice. (GX 401-8). The defendant continued by explaining "[w]e was 2 poles deep," meaning that he and his co-conspirators had two guns. (*Id.* at 2). "The first time no one" was hit, the defendant wrote, but then explained that the second time he was not sure because he "stood in the v," meaning he stayed in the vehicle during the second shooting. (*Id.* at 2-3). When the defendant's friend made fun of him for being a "Bitch boy sit t finna v," the defendant shot back: "I made the first movie tf," "WE CHILLED AND BEND BACK," "AND I LET MY SON MUNCH MAKE HIS." (*Id.* at 3-4). These messages clearly show the shooting that resulted in four people getting shot that early morning, including Ely getting shot in the jaw, was not only with the defendant's knowledge, but it had been the defendant's plan and with his consent. In another set of messages sent the next day to another Sev Side/DOA member, the defendant further stated: "We spun 2 twice in 30 mins," "We had 2 chops," "Mines and zay," "8 in each." (GX 401-4 at 3-4; Tr. 356 (CW-1) (identifying "wisoshotcha" as a member of Sev Side/DOA)). The defendant then told his friend that "We let that whole shit rippp," "we was tryna up the score board." (*Id.* at 5). Thus, in the defendant's own words, he made clear his integral role to the June 20, 2020 shooting. The defendant and his Third Side allies purposefully went to the 800s territory to shoot at rival gang members, with the defendant providing one of the two guns. When the group did not hit anyone the first time, they went back thirty minutes later and tried again. That time, Gant shot at such close proximity that he hit his mark—shooting Ely in the jaw, and hitting three others.

Furthermore, contrary to the defense's argument, the Government has also proven by a preponderance of the evidence that the defendant had the specific intent to kill. The defendant and his co-conspirators went back to the same building, within thirty minutes, to shoot at the small

Hon. Lewis J. Liman Page 3
December 12, 2025

crowd of people for the second time on June 20, 2020, because they were unsuccessful at shooting anyone the first time. In the defendant's own words, they went back and "let that whole shit rippp," in order to "up the score card." (GX 401-4 at 4). Perez himself later made clear his intent in "Who Really Bugging," a song glorying the June 20, 2020 attempted murder, that "[i]f he Gz, he get put in a coffin," with "Gz" referring to the 800 YGz. (GX 604-T; Tr. 809-810 (CW-2).) These lyrics were not just a public persona. Even in private messages, the defendant criticized others for having "no hits"—that is, no shootings or no kills. (GX 2414-72; Tr. 282–283 (CW-1)).

In any event, the Government need not prove that the *defendant* had the necessary intent to kill during this particular shooting. Rather the Government need only prove that the principal—here, Gant—had the requisite *mens rea*, and that the act was a racketeering activity that was foreseeable to the defendant and within the scope of what he had agreed to. The evidence supporting those findings is overwhelming.

First, the Government has proven that Gant had specific intent to kill when he ran up to the small crowd of people and chased them into the building as he shot at them in close range. The



screenshot from the surveillance video to the left captures how close Gant—in the multi-colored top—was to one of the individuals he was shooting at—the figure in the dark clothing in the entrance of the building—whom Gant had chased from the sidewalk. (GX 4101B). Officers recovered five shell casings. Courts have found sufficient evidence of specific intent to kill based on shooting multiple times at a victim at close range. *See, e.g.*, *United States v. Atehortva*, 69 F.3d 679, 687 (2d Cir. 1995) (concluding that a district court could find intent to murder where there was "undisputed evidence that [the defendant] repeatedly fired a gun at federal agents from close range"); *United States v. Stroman*, 498 F. App'x 67, 69 (2d Cir. 2012) (affirming application of attempted second-degree murder guideline where surveillance video showed defendant pursuing two men into a grocery store and firing a gun at them at close range); *see also United States v. Williams*, 583 F. App'x. 585, 586 (8th Cir. 2014) ("[T]he court could infer an intent to kill from Williams's firing seven gunshots at a crowd that included rival gang affiliates."); *United States v. Murillo*, 526 F. App'x. 192, 196 (3d Cir. 2013) (elements of first-degree murder met where defendant "elected at least once to fire his assault rifle directly at a group of people"); *United States v. Wright*, 594 F.3d 259, 268 (4th Cir. 2010) (affirming district court's conclusion that defendant committed first-degree murder by acting "willfully, deliberately, maliciously, and with premeditation" in causing death of an innocent bystander when he "sprayed the parking lot with gunfire"); *United States v. Green*, 2023 WL 7180645, at *1 (2d Cir. Nov. 1, 2023) (no clear error in district court's finding of intent to kill where "[v]ideo recording showed Green driving around the block to apparently scout the area immediately before the shooting and firing six shots in the direction of the intended victim.")

Second, ample evidence supports that this attempted murder was a racketeering activity of Sev Side/DOA. CW-1 and CW-2 both testified that Sev Side/DOA has a gang rivalry with the 800s. (Tr. 245 (CW-1); Tr. 759 (CW-2).). In particular, this gang rivalry was one they shared with Third Side, and thus the defendant going with Third Side members to commit the shooting nonetheless made this shooting a racketeering activity of Sev Side/DOA. (Tr. 246 (CW-1)

(explaining that the rivalry arose because "One of the Sev Side members was chilling with a Third Side member and ended up getting shot at."); Tr. 782 (CW-2) (explaining another instance in which Sev Side/DOA, Third Side, and another allied gang, ReyWay, all went to 800s territory to commit violence); *see also* GX 604-T (Iszayah Rowson, one of the Third Side members who participated in the June 20, 2020 shooting, rapping: "Monterey, Sev Block, that's gang ties")). Furthermore, Sev Side/DOA members go to rival gang territories primarily for the purpose of committing violence and to shoot at rival gangs. (Tr. 266 (CW-1)). And one of the ways to gain respect or status within Sev Side/DOA is to commit violence against rival gang members. (Tr. 393 (CW-1)).

Third, the attempted murder was reasonably foreseeable to the defendant. After all, based on the defendant's own account, he and his co-conspirators went to the 800s territory for the purpose of shooting not once, but twice, and the attempted murder happened the second time. It would have been reasonably foreseeable, if not the specific purpose of the agreement, that the defendant's co-conspirators were shooting to kill their rival gang members. Indeed, the defendant celebrated the deaths of his gang rivals. (*See, e.g,* GX 603A-T; https://genius.com/Kay-flock-is-ya-ready-lyrics).

Accordingly, the Probation Office did not err when it concluded the June 20, 2020 shooting was an attempted murder and included the racketeering activity in its calculation of the guidelines under U.S.S.G. § 2E1.1.

### B. June 26, 2020 Attempted Murder

It is undisputed that Side/DOA members Nicholas Johnson and Philip Santiago committed the June 26, 2020 attempted murder when they drove a scooter to the heart of rival Drilly territory fired at a group of people standing on a sidewalk from the middle of the street, hitting an eighteen-year old woman in the face. The defense disputes only that there is insufficient evidence to tie the defendant to the shooting and to show that the defendant had the intent to kill.

As discussed above, the Government need not prove that the defendant was the one who committed the attempted murder, as long as the attempted murder was a racketeering act that was foreseeable to the defendant and in furtherance of the conspiracy. There is plenty of evidence to support this. The shooting was committed by another member of Sev Side/DOA to retaliate for CW-1, a member of Sev Side/DOA, who had been shot just hours before. (Tr. 384-385 (CW-1)). Retaliating against a rival gang member is plainly within the scope of the activity of the Sev Side/DOA enterprise. Indeed, right after CW-1 was hit, the defendant tried to retaliate immediately but was grazed by a bullet. (GX 2357 at 3.) Thus, it was certainly foreseeable to the defendant that his fellow gang members would go to rival Drillys territory to commit the attempted murder to avenge the serious injury inflicted upon one of their own. The defendant himself posted Instagram posts and stories regarding his animosity towards the Drillys, his intent to commit violence against the Drillys, and his own past trips to Drillys territory to shoot or attempt to shoot at rival Drilly gang members. (*See e.g.,* GX 2309, 2322, 2330, 2330A, 2331, 2331A, 2336.) And, of course, the defendant himself popularized the Sev Side/DOA mantra, "GTG baby," which stands for get back gang baby, referring to Sev Side/DOA shooting back when they have been shot at. (*See e.g.,* GX 2304, 2404, 2406.)

   In any event, there is also sufficient evidence for the Court to find by at least a preponderance of evidence that the defendant did in fact aid and abet in the June 26, 2020 attempted murder.  CW-1's testimony that the defendant called CW-1 after CW-1 was taken to the hospital and told CW-1, in sum and substance, that they would retaliate for CW-1 is sufficient in itself.  CW-1's sister's testimony that CW-1 could not have made this phone call due to a photo where CW-1's hands were bandaged is undercut by her admission on cross-examination that she did not know when the photo was taken, that CW-1 had been hospitalized for more than a week, and that there was some period of time between CW-1's arrival at the hospital and when CW-1's sister arrived—when the phone call with the defendant likely occurred, given that the attempted murder itself took place just four hours after CW-1 was shot.  (*See* Tr. 1291-1293.)

   But the Court need not rely solely on CW-1's testimony.  Other evidence shows, at least by a preponderance of the evidence, that the defendant aided and abetted the June 26, 2020 attempted murder.  First, there was evidence that the defendant was motivated to retaliate and, in fact, attempted to retaliate.  About two hours after CW-1 was shot, the defendant sent Instagram messages to another individual, saying "I just had a oot out," meaning he just had a shoot out, "I got graised [sic]," "my son got hit in his stomach," referring to CW-1, and "I flocked back tho [angry emoji]!!" meaning the defendant shot back.  (GX 2357 at 3.)

   Second, the defendant was with the perpetrators before and after the shooting, so a reasonable inference can be made that they had discussed with the defendant the plan to commit the attempted murder—consistent with CW-1's testimony.  About three hours after CW-1 was shot, surveillance video captured the defendant and others welcoming the eventual shooters, Nicholas Johnson and Philip Santiago, into an apartment building.  (PSR ¶ 49; GX 3102, 3201, 3202; Tr. 227, 231 (CW-1)).  About an hour later, Johnson and Santiago left from that building to commit the attempted murder and then returned.  The defendant stayed in the building the entire time.  (GX 3104).

   Third, the defendant showed that he had inside knowledge of the shooting, consistent with him having been involved in the planning of it.  About one hour after Johnson and Santiago's retaliatory shooting, the defendant sent an Instagram message to another Sev Side/DOA member that stated "N**** Nick and PJ just made a movie," meaning that Johnson and Santiago (who went by the name "PJ") committed the shooting.  (PSR ¶ 50; GX 2355; Tr. 391 (CW-1), 806 (CW-2)).  The defendant then told another Sev Side/DOA member that he "better cop sum," meaning that the other Sev Side/DOA member need also retaliate.  When the other Sev Side/DOA member later said "The Get Back Is Important," the defendant responded "Duhh."  (GX 2355 at 7, 9.)  That exchange is further consistent with CW-1's testimony that the defendant made sure that Sev Side/DOA retaliated for CW-1.

   Although the Court need not find specifically that the defendant had the intent to kill—the Court need only find that the shooter had an intent to kill and that the attempted murder was reasonably foreseeable to the defendant—the defendant's intent can be inferred from the evidence.  The defendant had already shot back at the Drillys when they first came to 4646 Park Avenue and shot CW-1 in the stomach, but that was not enough.  The defendant and the others specifically planned for Johnson and Santiago to go to the heart of Drilly territory to commit this shooting at a group of people at close range.  The defendant's specific intent can also be inferred from his own statements of his desire to kill Drillys.  (*See generally* GX 604-T ("Die Drilly"); 2341 ("DIEE DRILLY [Angry Emoji]!!").

Based on the foregoing, the Government has proved by a preponderance of the evidence that the defendant aided and abetted in the June 26, 2020 attempted murder, or, in the alternative, that the June 26, 2020 attempted murder was a racketeering activity that was reasonably foreseeable to the defendant. Under either theory, the Probation Office correctly included the June 26, 2020 attempted murder in the Guidelines calculation.

### C. August 10, 2020 Attempted Murder



It is undisputed that on August 10, 2020, at approximately 11 p.m., two individuals fired a number of shots (officers later found 8 shell casings) at a small crowd of people gathered in front of a building in 800s territory, and that Ely, a member of the 800s, was shot in the leg, along with a 16-year-old girl who was also shot in the leg. (GX 4201; GX 4202, Tr. 1077–82 (Alvarez)). The screenshot to the right captures just how close one of the shooters came to the victims as he fired, evincing an intent to kill.

As with the other attempted murders, the defense argues that there is insufficient evidence that the defendant participated in this shooting.[1] The evidence here is straightforward: CW-2 testified that he saw Ely and the defendant on a FaceTime call, in which the defendant was taunting Ely, and Ely told the defendant that he and the 800s were outside. The defendant then showed himself from the inside of a car, implying that he was on the way, and then explicitly told Ely that he was going to see Ely "soon." (PSR ¶ 53; Tr. 812–14 (CW-2)). And then, as the defendant predicted, two individuals showed up to the location where Ely and the 800s were hanging out and opened fire. The defendant later took credit for shooting Ely, rapping in a song: "Shoot wit' double hands, that's how I got my aim / Ely got shot, he walkin' wit' a cane."[2] The Court may make the reasonable inference that the defendant did what he said he would do, and then bragged about the crime.

In any event, even if the defendant did not pull the trigger in this shooting, the Court may nonetheless consider the August 10, 2020 attempted murder for Guidelines purposes if the shooting was a racketeering activity that was foreseeable to the defendant. The defendant told Ely, in substance, that he was going to come and shoot him, and, in his songs, the defendant celebrated Ely's past injuries and threatened that the defendant and his gang members would commit further acts of violence against the 800s, the avowed rivals of Sev Side/DOA. The August 10, 2020 attempted murder was thus within the scope of the Sev Side/DOA conspiracy and was reasonably

---

[1] The defense argues that the defendant could not have been the perpetrator because the gun "allegedly connected to Mr. Perez was connected to police custody at the time of the shooting." It is unclear which gun the defense is referring to here, as the Government did not submit any evidence about which gun the defendant used for the shooting. The Government offered evidence that a gun was seized from the defendant on July 18, 2020—several weeks before the shooting (see Tr. 677–82 (Bacovic))—but at no time suggested that the seized gun was used in the August 10 attempted murder.

[2] See https://genius.com/Kay-flock-doa-lyrics.

foreseeable to the defendant, regardless of who actually pulled the trigger. Accordingly, the Probation Office correctly included the August 10, 2020 attempted murder in its calculation of the Guidelines.

### D. November 10, 2021 Attempted Murder

The jury returned a verdict convicting the defendant in connection with the shooting on November 10, 2021, in River Park Towers ("RPT"), and specifically found that the Government had proven that the defendant committed attempted murder that night. (Dkt. No. 231 at 2). Despite that clear finding, the defense argues there was no evidence regarding the defendant's specific intent to kill. That argument flies in the face of both the jury verdict and the weight of the evidence.

Evidence shows that the defendant and the others went to RPT with a premeditated plan. The defendant felt that RPT, a rival gang, had disrespected one of Sev Side/DOA's dead friends by kicking over candles at that person's vigil. (Tr. 428 (CW-1)). And so the defendant went to 4646 Park Avenue, the Sev Side/DOA headquarters, to gather his crew. (Tr. 229–31 (CW-1); GX 2106, 2206, 2207)). When they first drove to RPT, the defendant and his co-conspirators did not randomly let go rounds, as if all they intended to do was to scare their targets. Rather, the defendant and his co-conspirators circled RPT—and the three individuals standing in front of RPT—twice before opening fire the third time. When the defendant returned to the Sev Side/DOA apartment within 4646 Park Avenue, the defendant revealed his specific intent to kill when he expressed his regret that the intended targets, purported RPT rival gang members, "were too quick." (Tr. 427 (CW-1)). Furthermore, in public and in private, the defendant made numerous statements about his intent to kill specifically his rivals from RPT (*see, e.g.,* GX 2406A ("He get shot if he on River Park shit")), his intent to kill those who disrespect his dead friends (*see*, e.g., GX 602-T ("RIP the guys, disrespect the guys, you gon' meet the guys")), and the importance to him and to his reputation of having "hits" (*see, e.g.,* GX 2414-72, GX 2421 (arguing with a rival regarding how successful he is at shooting his rivals)).

The record provides ample evidence for the Court to find, by a preponderance of the evidence, that the defendant participated in the shooting with the intent to kill. Again, of course, the Court need not even go that far: it need only find that the shooter committed the shooting with the intent to kill, and that doing so was within the scope of the Sev Side/DOA conspiracy and was reasonably foreseeable to the defendant. The shooter, aided by the defendant, fired multiple rounds at a group of gang rivals who were standing on the corner. The jury properly found that the shooting constituted attempted murder, and the Probation Office correctly reached the same conclusion.

### E. Leadership Enhancement

The defense also disputes the applicability of the four-level leadership enhancement. There is no dispute that Sev Side/DOA is an enterprise that involved five or more participants—the Indictment alone charged six members of Sev Side/DOA—so the question is whether there is sufficient evidence that the defendant acted as an organizer or leader of the criminal activity. In determining whether a defendant was a leader or organizer, the Court may consider the following factors: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope

of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, comment, (n.4); *see United States v. Huerta*, 371 F.3d 88 (2d Cir. 2004). Here, there is ample evidence in the record to support the application of the four-level leadership enhancement in view of these factors.

First, CW-1, a Sev Side/DOA insider, testified that the defendant was a leader of the younger generation of Sev Side/DOA. In fact, CW-1 testified that the term "DOA" became more popular "when [the defendant's] music went up," reflecting the defendant's influence over the group. (Tr. 189). More specifically, CW-1 explained the ways in which the defendant directed or influenced the criminal affairs of Sev Side/DOA: CW-1 testified that the defendant started and escalated some of the gang rivalries that Sev Side/DOA participated in (Tr. 246-248 (rivalry with RPT); 248-49 (rivalry with OYz)); the defendant belittled other members whom he felt were not sufficiently contributing to the gang by either bringing in money or otherwise committing shootings (Tr. 375-376); the defendant received money from other Sev Side / DOA members to pay for his studio time (Tr. 343); and the defendant was the main instigator of at least two shootings, the June 26, 2020 shooting discussed above in which the defendant assured CW-1 that the gang would retaliate on CW-1's behalf and other members of Sev Side/DOA committed the retaliatory shooting, and the November 10, 2021 shooting, in which the defendant supplied the firearm and the motivation for the shooting.

Second, CW-2, a rival gang member from the 800s—a neighboring gang with whom Sev Side/DOA was in frequent conflict—also testified that he perceived the defendant to be the leader of Sev Side/DOA. (Tr. 771). CW-2 also corroborated CW-1's testimony that the defendant was responsible for instigating new gang rivalries—in other words, had sufficient influence and control within Sev Side/DOA to turn a dispute he had with a group into a dispute for the entire gang. (Tr. 883).

Third, the defendant's own messages to other members of Sev Side/DOA reflect his leadership position within the gang. In a series of messages to a member of ReyWay, an allied gang, the defendant said: "WHEN WE ON THE REY WE DO WAT WE WANT ESPECIALLY MEEEE," implying that there the defendant had an elevated position from the rest of Sev Side/DOA. (GX 2414 at 9.) The defendant then followed up: "WRDA BRO NO ONE DOING WAT THEY WANTTTTT ON MY BLOCK TFFFF," "IF I SAY N*s NOT DOING THAT ON MY BLOCK AND N*s STILL ATTEMPT TO YAH KNOW WAT COME AFTER THAT," laying out the defendant's apparent authority over his gang territory. (GX 2414 at 10). Publicly, the defendant posted a photo on Instagram with the caption "YOUNGEST IN CHARGE AND STAMPED!!!!" reflecting his own view of his leadership status within the gang. (GX 2405).

The defense also argues that the defendant cannot have been a leader of Sev Side/DOA because [redacted]

According to the defense's submission, the defendant is a platinum-selling recording artist who signed a $1.2 million record deal. (*See also* Tr. 1320 (Diaz)). That conduct is at odds with the portrait the defense submission attempts to paint of a defendant ███████████████████████ ██████████████ n any event, the evidence at trial demonstrated that, ████████████████████████████████████, he was the one leading the charge on the street—not the other way around.

Finally, the defense argues that the defendant could not have been the leader because he was "managed" on the street by CW-1 due to the defendant's purported intellectual disability. There is absolutely no evidence in the record to support that claim. It is true that the defendant joined the Sev Side gang when he was younger than CW-1 and that they were friendly. But there is no evidence that CW-1 "managed" the defendant in any way. In fact, CW-1 explained that the primary disagreement that the older generation of Sev Side (of which CW-1 was part) had with the younger generation (which the defendant led) was that the younger generation was "making the block hot, causing attention and bringing police when [the older generation] was trying to sell drugs." (Tr. 450). That disagreement reflects that CW-1 and the older generation were unable to manage the defendant and his peers, as they committed violence and brought unwanted police attention to the neighborhood.

The defendant's baseless claim that CW-1 was the real leader of Sev Side/DOA is another transparent attempt to deflect responsibility in any way he can. Considered alongside the defendant's Instagram post after the jury verdict to "KILL ALL RATS"—an unmistakable shot at CW-1—the facts demonstrate that the defendant has not meaningfully changed.

Hon. Lewis J. Liman  Page 10
December 12, 2025

      Accordingly, the Court should reject the defense's challenges to the Probation Office's calculation of the Guidelines.

                        Respectfully submitted,

                        JAY CLAYTON
                        United States Attorney for the
                        Southern District of New York

By:   /s/_____
        Michael R. Herman
        Patrick R. Moroney
        Ni Qian
        Assistant United States Attorneys
        (212) 637-2221 / -2330 / -2364

Cc (by ECF):  All counsel of record